George L. JANTZER et al., Petitioners,

v.

COMMISSIONER OF INTERNAL REVENUE, Respondent.

No. 16612.

United States Court of Appeals Ninth Circuit.

Nov. 3, 1960.

Frederick H. Torp, Portland, Or., Carl M. Brophy, Medford, Or., Cleveland C. Cory, Portland, Or., for petitioners.

Charles K. Rice, Asst. Atty. Gen., Lee A. Jackson, Grant W. Wiprud, Sharon L. King, Attys., Dept. of Justice, Washington, D. C., for respondent.

Before BARNES, HAMLEY and HAMLIN, Circuit Judges.

BARNES, Circuit Judge.

This is a timely petition for review of decisions of the Tax Court (32 T.C. 161) holding that certain additional taxes were payable for the years 1952 and 1953 by petitioning taxpayers, partners in the Trail Creek Lumber Co., a partnership, by reason of moneys received under the terms of a certain contract. The Commissioner of Internal Revenue had re-duced the amounts of capital gains reported by that partnership, and to a similar extent, had increased its ordinary income. Such increase, of course, was payable by the individual partners.

The principal question before the Tax Court was the applicability of section 117(k) (2) of the Internal Revenue Code of 1939, 26 U.S.C.A. § 117(k) (2), which if applicable would authorize the taking of the income as capital gains. If that question were to be decided adversely to petitioners, there was an alternative assertion that the transaction amounted to a sale of capital assets under section 117 (a) (4) of the same Code.

The cases below were consolidated for trial, and tried on a stipulation of facts plus the testimony of Edmund W. Pease. While the returns here considered involve only the years 1952 and 1953, chronologically petitioners' story commences in 1946.

Early in 1946, George L. Jantzer, Emma E. Jantzer (his wife), Edmund W. Pease and Ethel E. Pease (his wife), were partners in the George L. Jantzer Lumber Co., a partnership (herein designated as partnership No. 1). On February 14, 1946, that partnership entered into a timber contract with Stanley W. Dwinnell. This is hereafter called the Dwinnell contract, and is Exhibit 14N in evidence.

Sometime prior to April 15, 1946, the four partners in the George L. Jantzer Lumber Co., together with Theodore G. and Lorraine Jantzer, formed the Trail Creek Lumber Co., a partnership (herein designated as partnership No. 2). On that date (April 15, 1946), the Dwinnell contract was assigned in writing by partnership No. 1 to partnership No. 2.[1] Dwinnell consented in writing. From April 15, 1946, until late 1949, this partnership No. 2 engaged in the business of logging, sawing and manufacturing of

---

1. On January 1, 1951, Lewis L. and Dorothy P. Jantzer became partners in partnership No. 2. Whether Lewis L. Jantzer (or his wife) had previously been organizers or stockholders in the corpo-ration (Trail Creek Lumber Co., Inc.) is not disclosed by the record, although it is so alleged. But all six Jantzers were stockholders in 1952 and 1953, the years here in question.

lumber. On July 11, 1946, partnership No. 2 had leased certain timber land known as the Onn tract, and on March 22, 1951, acquired fee simple title to that tract. On December 19, 1949, the three male partners in partnership No. 2 (Trail Creek Lumber Co.) and Lewis L. Jantzer, organized a corporation, Trail Creek Lumber Co., Inc. (hereinafter referred to as the corporation).

From and after January 1, 1950, the corporation, pursuant to an oral arrangement between it and partnership No. 2, cut, removed and paid for the Dwinnell timber. On January 3, 1950, partnership No. 2 sold its manufacturing, logging, office equipment and sawmill site to the corporation.

On June 6, 1951, partnership No. 2 conveyed title to the Onn property to the corporation, reserving orally "the few remaining standing trees."

In the taxable years 1952 and 1953, the Trail Creek corporation cut, removed and paid partnership No. 2 for timber on the Onn tract pursuant to an oral arrangement similar to the oral arrangement with respect to the Dwinnell contract.

The payments received by the partnership from the corporation on the amount of timber cut and removed from the Dwinnell and Onn tracts were as follows:

| Year | Payments Rec'd | Costs | Net Gain |
|---|---|---|---|
| 1952 | $108,095.91 | $40,273.13 | $ 67,822.78 |
| 1953 | 172,290.21 | 60,161.17 | 112,129.04 |

Of these aggregate payments received by the partnership in 1952 and 1953, the amounts of $787.52 and $555.36 represented payments with respect to the disposal of timber on the Onn tract.

The oral agreement under which the corporation took over the obligation of partnership No. 2 with Dwinnell is characterized by the government as a "loose oral arrangement which was terminable at the will of either party." It was, says the government, in the nature of a continuing offer for the sale of so much of the Dwinnell timber as was cut and manufactured and "accepted by the corporation's act of cutting and manufacturing with respect to each tree." [2] To support this theory, the government points out that Dwinnell paid the state taxes on the Dwinnell tract; the corporation paid them on the Onn tract. No fire insurance was carried by partnership No. 2 on any timber. The Dwinnell contract did not require the partnership to carry insurance, but provided merely that if lumber were destroyed by fire, "any insurance that the Purchaser may carry thereon shall be paid to the parties herein pro rata as their interest may appear."

The Tax Court found (a) that the Dwinnell contract conveyed no title to timber, and hence the partnership could not have held the timber it sold, as it was cut and manufactured, for more than six months before the sale; (b) that partnership No. 2 and the corporation entered into a loose, oral arrangement terminable at the will of either party, which did not constitute a binding contract; [3] (c) that after the partnership sold its equipment on January 3,

---

2. There was also involved the Murhard tract, previously cut over, purchased in 1949. It is of no direct significance herein except to recite the partnership did pay state taxes on this tract, a circumstance unlike that with respect to the other two tracts.

3. Edmund W. Pease was the only witness as to this arrangement between corpora-

tion and partnership No. 2. He stated it was oral; that it had no express duration; that the corporation had no obligation to cut and remove timber; and, that the partnership had no obligation to sell to the corporation; that it was terminable by either party at any time as the parties saw fit. While this testimony was at times contradictory, and the witness may have been confused, so that it

1950, it had no trade or business other than selling timber. The Dwinnell arrangement appears in the margin.[4]

was necessary to rescue him on redirect examination, it was amply sufficient to support the findings made by the Tax Court.

4. The full text, except for a description of the property, is as follows:

"Agreement

"This Agreement, Made and entered into by and between Stanley W. Dwinnell, a single man, of 1217 Plymouth Building, Minneapolis, Minnesota, hereinafter known as Vendor, and Geo. L. Jantzer Lumber Company, a co-partnership consisting of George L. Jantzer, Emma E. Jantzer, Edmund W. Pease and Ethel E. Pease, of 537 Spencer Street, Medford, Oregon, hereinafter known as Purchaser, Witnesseth:

"The Vendor agrees to sell to the Purchaser, and the Purchaser agrees to buy from the Vendor all merchantable Sugar pine, Ponderosa Pine, Douglas fir and White fir timber situate upon the real property belonging to the Vendor in Jackson County, Oregon, described as follows, to wit:

[property described]

\*　　\*　　\*　　\*　　\*

for the purchase price and on the terms and conditions as hereinafter provided.

"Purchaser to Manufacture Into Lumber

"The Purchaser agrees to cut and log all of said timber and manufacture same into lumber at a mill, or mills, to be provided or chosen by the Purchaser in Jackson County, Oregon.

"Price, How Computed

"The Purchaser agrees to pay to Vendor, based upon the lumber to be so provided from said timber, at the rate and in the amounts as follows:

$8.00 per thousand board feet of Sugar pine;

$6.00 per thousand board feet of Ponderosa pine;

$4.00 per thousand board feet of Douglas fir;

$2.50 per thousand board feet of White fir.

"In the event that the market price of lumber shall drop $5.00, or more, and less than $10.00, below the present market value of lumber, the price to be paid therefor, as aforesaid, shall be reduced 50 cents per thousand for each of such species of timber, and in the event that such market price shall drop $10.00, or more, below the said present market price, the price to be paid for such timber, as afore-

Petitioners urge they were entitled to treat the sums mentioned as capital gains, for several reasons: *first*, the Tax

said, shall be reduced $1.00 per thousand board feet thereof.

"It is further agreed that in the event that the market price of lumber shall increase $5.00 per thousand and less than $10.00 per thousand, the amount to be paid for such timber, as aforesaid, shall be increased 50 cents per thousand, and in the event that the market price of such lumber shall increase $10.00, or more, per thousand the price of said timber shall be increased in the amount of $1.00 per thousand.

"The foregoing schedule of prices to be paid as aforesaid shall apply to all timber other than that manufactured to #4 and #5 common, and #4 and #5 common shall be paid for at one-half the rates hereinabove provided.

"For the purposes aforesaid the market price of lumber as of the 14th day of February, 1946, shall be considered to be the government ceiling price thereof as of this date, and hereafter from time to time the ceiling price of lumber as fixed by the federal government shall be considered the market price thereof, unless the Purchaser in making sales with due diligence in the usual course of trade shall not be able to procure the full ceiling price therefor, in which event the actual price for which such lumber shall be sold shall be considered the market price. The said market price of lumber above referred to shall be considered the price thereof f.o.b. the cars at the shipping point in said County.

"If in the production of such lumber the Purchaser shall produce and sell any timber products other than lumber, he shall pay to the Vendor 20% of the amount for which same shall be sold.

"Amount of Timber, How Computed

"The number of board feet of such timber shall be computed by the amount of lumber to be produced therefrom: and the Purchaser agrees that all lumber so produced shall be marketed by him in the usual course of business, and the purchaser will pay the Vendor for the several species of lumber at the rates above specified in accordance with the board feet of such lumber as shown by such sales.

"Payment When Made

"The Purchaser has this day paid to the Vendor the sum of Twenty Thousand ($20,000.00) Dollars as a down payment on the purchase of said timber; receipt whereof is hereby acknowledged. $10,000.-00 of said down payment is hereby ap-

·Court had approved of such treatment of moneys received under similar circumstances (even to an oral contract) in the L. D. Wilson case, 26 T.C. 474; *second,*

plied to the purchase of the timber last to be cut under this agreement and the remainder of said down payment shall be applied to the payment of 50% of the moneys to become due hereunder for said timber as hereinafter provided:

The Purchaser agrees that on or before the 10th day of each month during the term hereof, it will render to the Vendor a full and accurate account of all timber sold hereunder during the preceding month, as aforesaid, including duplicate invoices of all sales and such other data as may be required in the determination of the volume of such timber and at the time of the rendering of such accounting it shall pay to the Vendor one-half the price thereof, and the remaining one-half thereof shall be deducted from said sum of $10,000.00 to be paid as aforesaid, until the full sum of $20,000.00 worth of such timber shall have been so accounted for, and thereafter payment in full shall be made at the time of each such monthly accounting until it shall be determined · that there is only $10,000.00 worth of timber remaining on said entire tracts, and thereupon the said sum of $10,000.00 to be applied to the timber last to be cut as aforesaid shall be applied toward the payment of the amount shown by such monthly accounting.

### "Amount To Be Cut and Paid For Each Year

"Purchaser agrees that he will, during the remainder of the calendar year of 1946 and during each and every year thereafter until all of the timber has been so cut and paid for hereunder, cut and pay for hereunder as above provided at least Three Million board feet of such timber, and if during the said remainder of the year 1946 and during any calendar year thereafter the Purchaser shall fail to so cut and pay for at least Three Million board feet of such timber, he will, on or before the 10th day of January of the succeeding year pay to the Vendor the sum of $4.00 for each and every thousand board feet of the deficiency between the amount so cut and paid for and the said Three Million board feet; the said sum to be so paid to be applied toward the payment of the timber next to be cut and paid for hereunder. Nothing herein contained however shall release the Purchaser from cutting and paying for at least Three Million board feet of such timber per year, as aforesaid.

"Title to all such timber and all products produced therefrom shall be and remain in the Vendor until paid for as herein provided, and in the event that the Purchaser shall leave any merchantable logs in the woods for an unreasonable length of time or shall fail to make sales of such lumber as herein provided the number of board feet contained in such logs and the number of board feet of such lumber shall be computed according to the usual practise, and the Purchaser will pay therefor upon demand at the rates above provided; provided however, if any of such lumber shall be destroyed by fire any insurance that the Purchaser may carry thereon shall be paid to the parties hereto pro rata as their interest may appear.

### "Buildings, Roads, etc.

"During the term hereof the Purchaser shall have the right to build such roads, construct and operate such camps, mills and other facilities as may be necessary or proper for the conduct of such logging and milling operations.

### "Operations to Comply With Law

"All such operations of the Purchaser shall be conducted, and all slash shall be disposed of, strictly in accordance with the requirments of all State and Federal forestry regulations applying thereto.

### "Merchantability

"Any trees which contain one or more logs merchantable as hereinafter defined having a net total scale of 25%, or more, of the total volume of the tree will be considered merchantable; all logs are merchantable which are not less than Twelve (12') feet long and after deduction for visible indications of defects scale One-third ($\frac{1}{3}$) of their gross scale; provided no logs which scale less than Fifty (50) board feet shall be considered merchantable, and large knots shall be considered as defects.

### "Inspection

"Vendor shall have the right at all reasonable times to inspect all operations of the Purchaser hereunder and to examine all records and books of account pertaining to the amount of lumber so produced from said timber and all records of sales thereof.

### "Liens

"Purchaser will pay promptly all debts of every kind that he may incur in connection with his operations hereunder, and will not cause, suffer or permit any liens to accrue against such logs or lumber by, through or under him.

### "Title to Pass on Payment

"Anything herein contained to the contrary notwithstanding, it is agreed that at and when any of said timber shall be cut

that Oregon law prevails, and that under it the partnership, as a conditional vendee, was the *equitable owner* of the timber, even though the *legal title* was held by the original owner, Dwinnell; *third*, and in the alternative, that even if § 117 (k) (2) of the Internal Revenue Code of 1939, especially applicable to sale of timber, is held inapplicable because there was no "disposal" of that which was

and manufactured into lumber and paid for as herein provided, the portion thereof so paid for shall vest in the Purchaser as of that time, and it is further understood that the Vendor does not know or make any representation as to the amount of merchantable timber situate on said premises.

"Performance

"Purchaser agrees to perform all operations hereunder in a good and workmanlike manner and will use due diligence to minimize the hazards of the fire on said premises.

"Logging Restrictions

"Purchaser agrees to log all merchantable timber as the operation proceeds in any natural logging area.

"No unecessary damage shall be done to the young growth or to the trees left standing.

"Any trees left cut, which contain merchantable material, and which are cut, injured through carelessness, or killed by fire which the Purchaser, its employees or contractors, or employees of contractors, cause by their negligence, or the origin or spread of which he or they could have prevented by exercise of due care, shall be paid for at the contract price fixed by the terms of this agreement. Timber wasted in tops or stumps, timber broken by careless falling, and any timber merchantable according to the terms of this agreement which has been cut but which is or is not removed from any portion of said premises when operations hereunder are completed, shall be paid for at the contract price for such timber.

"Stumps shall be cut not higher than 18 inches on the side adjacent to the highest ground, unless a higher stump will eliminate defects in the first log.

"Title to Revert to Vendor

"Upon the termination of this agreement all right, title and interest of the Purchaser in and to any of the timber herein agreed to be sold and in and to any rights whatsoever in and to said premises or any part thereof, shall wholly cease and terminate and all moneys theretofore paid hereunder shall be retained by the Vendor either as payment for timber cut hereunder, as rental and as liquidated damages.

"Default

"Time shall be the essence hereof and in the event that the Purchaser shall become in default in the making of any of the payments of the purchase price as herein provided, or shall otherwise become in default in the performance of any of the terms and conditions herein contained on the part of the Purchaser to be performed, and in the event that such default shall continue for the period of 30 days after notice of such default shall have been given by the Vendor to the Purchaser, directed to the Purchaser by registered mail at its address above given, or such other address as the Purchaser may specify in writing, then and in that event this agreement and all the right, title and interest of the Purchaser hereunder shall wholly cease and terminate without any right of reclamation or compensation for moneys paid hereunder, or otherwise, and in the event that the Vendor shall institute any suit or action to enforce any right hereunder the Purchaser will pay to the Vendor such additional sum as the Court may adjudge reasonable as attorney's fees for the prosecution of such suit or action.

"Payment, Where Made

"All payments to become owing from the Purchaser to the Vendor hereunder, other than the initial payment of $20,-000.00 aforesaid, shall be made at the Medford Branch, The First National Bank of Portland, and the duplicate invoices and other data showing the computation of such payments shall be mailed to the Vendor, directed to his address above stated.

"Heirs and Assigns

"This agreement shall inure to the benefit of and shall be binding upon the parties hereto, their heirs, executors, administrators, successors and assigns, provided, however, the Purchaser will not assign its interest in this agreement without the consent of the Vendor in writing first had and obtained.

"In Witness Whereof, the parties hereto have executed these presents in triplicate this 14th day of February, 1946.

"/s/ Stanley W. Dwinnell,
         Vendor
Geo. L. Jantzer Lumber Company,
/s/ By Geo. L. Jantzer,
/s/ By Emma E. Jantzer,
/s/ By Edmund W. Pease,
/s/ By Ethel E. Pease,
        Purchasers."

"owned," there was a sale of a capital asset held for more than six months, under § 117(a)(4) of the Internal Revenue Code of 1939.

The Internal Revenue Code of 1939, in § 117—"Capital gains and losses"—provides in material part:

"* * * (k) *Gain or loss in the case of timber or coal.*—

"(1) If the taxpayer so elects * * * the cutting of timber (for sale or for use in the taxpayer's trade or business) * * * by the taxpayer who owns, or has a contract right to cut, such timber (providing he has owned such timber or has held such contract right for a period of more than six months * * *) shall be considered a sale or exchange of such timber cut * *.

"(2) In the case of the disposal of timber * * * held for more than 6 months prior to such disposal, by the owner thereof under any form or type of contract by virtue of which the owner retains an economic interest in such timber * * * the adjusted depletion basis thereof shall be considered as though it were a gain or loss, as the case may be, upon the sale of such timber * *." 26 U.S.C.1952 ed. § 117.[5]

Section 117(a), "Definitions," provides:

"117. *Capital gains and losses*

"(a) *Definitions.* As used in this chapter—

"(1) *Capital assets.*—The term 'capital assets' means property held by the taxpayer (whether or not connected with his trade or business), but does not include—

"(A) stock in trade of the taxpayer or other property of a kind which would properly be included in the inventory of the taxpayer if on hand at the close of the taxable year, or property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business;

"* * * * * *

"(4) *Long-term capital gain.*— The term 'long-term capital gain' means gain from the sale or exchange of a capital asset held for more than 6 months, if and to the extent such gain is taken into account in computing gross income."

Section 117(j) (as added by Sec. 151(b) of the Revenue Act of 1942, and amended by Sec. 127(b) of the Revenue Act of 1943, c. 63, 58 Stat. 21) provides in material part:

"*Gains and losses from involuntary conversion and from the sale or exchange of certain property used in the trade or business.*—

"(1) *Definition of property used in the trade or business.*—For the purposes of this subsection, the term 'property used in the trade or business' * * * also includes timber or coal with respect to which subsection (k)(1) or (2) is applicable * * *.

"(2) *General rule.*—If, during the taxable year, the recognized gains upon sales or exchanges of property used in the trade or business, plus the recognized gains from the compulsory or involuntary conversion (as a result of destruction in whole or in part, theft or seizure, or an exercise of the power of requisition or condemnation or the threat or imminence thereof) of property used in the trade or business and capital assets held for more than 6 months into other property or money, exceed the recognized losses from such sales, exchanges, and conversions, such gains and losses shall be considered as gains and losses from sales or exchanges of capital assets held for more than 6 months * *."

In the light of the law applicable, we examine the Dwinnell contract. Among its more important features are these:

1. Purchaser agreed to buy timber located on certain property.

2. Title to timber passed only when timber was cut, manufactured into lum-

---

5. As added by Sec. 127(a), Rev.Act of 1943, 58 Stat. 46, and as amended by

Sec. 325(b), Rev.Act of 1951, 65 Stat. 501.

ber, and paid for, "anything herein contained to the contrary notwithstanding."

3. If timber was cut and manufactured into lumber but was not paid for, title still remained in Dwinnell.

4. Under the provisions of the contract, fifty per cent of the price was paid to the vendor. Thus Dwinnell had the disadvantage (and advantage) of a lower (or higher) price for the lumber. Of course, the partnership, and later the corporation, shared such advantage and disadvantage.

5. The contract provided for a price geared to the going market price, to be adjusted up or down.

6. Nothing in the contract provided for the payment of taxes. The record discloses that Dwinnell paid taxes.

7. The provision that there should be no assignment by purchaser without consent of vendor is at variance with any ownership theory in the purchaser.

8. The purchaser was rendered liable only for loss due to fires caused by its negligence, or "in the origin or spread of which * * * could have [been] prevented by exercise of due care."

We note that in L. D. Wilson, supra (June 7, 1956), the following differences existed between the Vaughn contract therein involved and the Dwinnell contract here involved. In the Vaughn contract, the price was a fixed price at $4.50 per thousand feet, delivered at the mill; payable on the 10th for all logs scaled the previous month; purchaser paid all taxes accruing forty days after the contract was entered into; there was no restriction on assignment; liability was on purchaser for loss by fire due to operations, and purchaser agreed to hold vendor harmless for claims for damages, and all damage to timber.

In Wilson, the contract was to be completely performed in six years; the Dwinnell contract was to be performed at the rate of three million board feet per year.

Despite these differences between the Vaughn contract and the Dwinnell contract, it is difficult to see how the decisions of the Tax Court in the two cases can be reconciled. But it is not our duty to attempt to reconcile decisions of the Tax Court. Nor is it our province to determine the question de novo; nor even to be influenced by what we may think our conclusion on the same or similar facts should be. We have but one matter to consider—Is the decision of the Tax Court clearly erroneous?

We note the L. D. Wilson case was not appealed. We have no way of knowing what the result of an appeal therein might have been, nor what emphasis was herein placed by the Tax Court on those facts which differ from the facts in the Wilson case. A considerable difference in the facts of the two cases exists. The difference in the provisions for the payment of the taxes, alone, might be a sufficient basis to require a difference in the result. The obligation to market all the timber, rather than a certain amount each year may have been important in determining whether the agreement was a lien or a sale. The liability for fires, which is such a tremendous hazard in the timbering industry, may well have swayed the trial court to a different result. We do not know. But we do know we cannot say, as a matter of law, the Tax Court's opinion was clearly erroneous.

Recent developments in Oregon case law may strengthen the Wilson decision, but they do not compel the conclusion that Wilson is indistinguishable from the case at bar. The Oregon court in Paullus v. Yarbrough, Or.1959, 347 P.2d 620, held that the equivalent of an interest in land passed to buyers under a contract requiring buyers to remove a certain quantity of timber within a limited time. Hence the Paullus case supports the Wilson case since there was a similar requirement in the Vaughn contract. In the instant case, while there was no specified time limit within which the work was to be done, there was a minimum requirement of three million board feet per year to be cut, and if not so cut, to be paid for in any event. This, say petitioners, is the equivalent of a time limit.

Thus it must be conceded that as to one consideration relevant here, the authority of Wilson has been enhanced. Nevertheless, the distinctions between Wilson and this case, previously noted, are still important. Especially notable is the fact that here, unlike Wilson and Paullus, the landowner paid the taxes, a matter which the Tax Court found to be extremely significant (1959, 32 T.C. 161). Hence it cannot be said that the Tax Court was clearly erroneous in distinguishing Wilson and in finding that there was no sale of realty in the case at bar, and hence the petitioners were not owners.

But, say petitioners, as we understand them, the word "owner" as employed by the Congress in section 117(k) (2) embraces not only the usual sense of that term, but, as well, a holder of a contract right to cut timber who can dispose of it, or manufacture it, for his own account.

The government points out the difference between a cutting of timber which falls within section 117(k) (1) (where the taxpayer must "own" or "[have] a contract right to cut") and section 117 (k) (2) (where there must be a disposal of timber by the owner, as that term is usually understood, under any form of contract "by virtue of which the owner retains an economic interest in such timber"). Thus an *owner* holding an economic interest in timber is not in the same category, tax wise, as a nonowner who holds a contract right to cut timber. The history of section 127 of the Revenue Act of 1943 supports such a distinction. The Senate Report issued when this legislation was enacted, states:

"The law discriminates against taxpayers who dispose of timber by cutting it as compared with those who sell timber outright. The income realized from the cutting of timber is now taxed as ordinary income at full income and excess profits tax rates and not at capital

gain rates. In short, if the taxpayer cuts his own timber he loses the benefit of the capital gain rate which applies when he sells the same timber outright to another. Similarly owners who sell their timber on a so-called cutting contract under which the owner retains an economic interest in the property *are held to have leased* their property and are therefore not accorded under present law capital-gains treatment of any increase in value realized over the depletion basis.

\*     \*     \*     \*     \*

This latter provision will afford relief *to those who have leased* their property under a contract whereby they retain an economic interest in the timber and are not entitled under the present law to capital gains treatment because of that fact." S. Rep. 627, 78th Cong., 1st Sess., pp. 25, 26 (1944 Cum.Bull. 973, 993). (Emphasis added.)

In other words, § 117(k) (1) applies to an owner *or to one*, who, *having a contract right to cut*, cuts his timber; § 117 (k) (2) applies only to *owners* who do not cut, but contract with others to cut, retaining an economic interest in the cut timber. Such an interpretation was followed in Island Creek Coal Co. v. Commissioner, 30 T.C. 370.[6]

In Carlen v. Commissioner, 9 Cir., 1955, 220 F.2d 338, 340, this court said:

"The statute speaks of the cutting of timber for sale by a taxpayer who has a right to cut such timber. To us this means that the taxpayer who would claim the benefit of the statute must be the one who has not only the right to cut but also the right to sell on his own account. The taxpayers here were not such persons. We agree with the Commissioner that the statutory language does not cover a taxpayer who

---

6. This has been changed by the 1954 Code. Prior to the enactment of section 631 of the Internal Revenue Code of 1954, 26 U.S.C.A. § 631, section 117(k) applied to both coal and timber. It was changed

by the Congress to *redefine* what constituted an "owner." The reports show the change was just that, and not a correction of a wrongly interpreted previously existing law.

cuts timber in which he himself has no proprietary interest which he can dispose of by sale.

"'Neither, in our opinion, can the petitioners qualify as taxpayers cutting the timber "for use in the taxpayer's trade or business" as required by the statute.'"

We thus conclude that the Tax Court was correct in deciding that under the Dwinnell contract the taxpayers' partnership was not the "owner" of the timber on the Dwinnell tract within the meaning of section 117(k) (2). Cf. Anderson v. Moothart, 1953, 198 Or. 354, 256 P.2d 257; Coquille Mill & Tug Co. v. Robert Dollar Co., 1930, 132 Or. 453, 285 P. 244; Elliott v. Boyd, 1902, 40 Or. 326, 327, 67 P. 202.

 We likewise agree with the Tax Court's position that the oral agreement between the corporation and partnership No. 2 was in the nature of a continuing offer to sell, rather than an actual disposal. The court found no "disposal" until the timber was cut, manufactured and paid for. There was thus simultaneous payment and disposal, and no retaining of any economic interest after disposal, in any event. No written contract existed. The oral testimony clearly supports the finding of a continuing offer to sell.[7] Ah Pah Redwood Co. v. Commissioner, 9 Cir., 1957, 251 F.2d 163.

Under the interpretation of the agreements made by the Tax Court, and hereinabove supported, there was no holding of a capital asset by taxpayers for more than six months with respect to the Dwinnell contract. This is an essential element of § 117(a) (4). There had been no formal assignment of the Dwinnell contract from partnership No. 2 to the corporation (as there had been in assigning from partnership No. 1 to partnership No. 2), and there was no compliance with the terms of the Dwin-

nell contract which required Dwinnell's written consent to any assignment (again, as there had been in assigning the contract from partnership No. 1 to partnership No. 2).

Title to the Onn timber had been held for more than six months by the partnership. But it was, according to the Tax Court, "property held by the taxpayers primarily for sale to customers in the ordinary course of its trade or business," and hence the products of its sale were ordinary income, and it was not a "capital asset" as defined in § 117(a) (1) (A). The Tax Court found that at least after the partnership sold everything it used to cut and manufacture timber, prior to January 3, 1950, it had no trade or business other than selling timber. Such a finding is not clearly erroneous on the record before us.

The decision of the Tax Court is affirmed.

---

7. Testimony of Edmund W. Pease:

"Q. Did the partnership have to give any timber or sell any timber to the corporation? A. They did not have to, no. * * * It was a continuing—a continuing agreement from year to year, as long as both parties carried out their part of it.

"Q. Could either party terminate the arrangement as they saw fit, or within their own discretion at any time? A. I'd say they could."