George D. PATTERSON, District Director of Internal Revenue, Appellant,

v.

W. A. BELCHER et al., Appellees.

James R. ABERNATHY, Jr., and Mary Belcher Abernathy, Appellants,

v.

George D. PATTERSON, District Director of Internal Revenue, Appellee.

No. 18925.

United States Court of Appeals
Fifth Circuit.

April 19, 1962.

Sharon L. King, Atty., Dept. of Justice, Louis F. Oberdorfer, Asst. Atty. Gen., Lee A. Jackson, Atty., Dept. of Justice, Washington, D. C., W. L. Longshore, U. S. Atty., Birmingham, Ala., Meyer Rothwacks, Robert N. Anderson.

Attys., Dept. of Justice, Washington, D. C., Macon L. Weaver, U. S. Atty., Malcolm L. Tanner, Asst. U. S. Atty., for appellant.

Erle Pettus, Jr., Al. G. Rives, Birmingham, Ala., for appellees, Rives, Peterson, Pettus & Conway, Birmingham, Ala., of counsel.

Before RIVES and WISDOM, Circuit Judges, and CARSWELL, District Judge.

CARSWELL, District Judge.

Seven actions were instituted in the District Court wherein the plaintiffs sought income tax refunds for taxes allegedly overpaid. The Director of Internal Revenue appeals from adverse findings of fact and conclusions of law. In cross appeal filed by two of the plaintiffs, in one case, there is an attack on the verdict of the jury and upon the refusal of the court to grant directed verdict for the plaintiffs. The questions presented by the Director will be treated in I and II below. The question raised regarding the appeal of James R. Abernathy, Jr., and Mary Belcher Abernathy from the determination of the jury will be discussed in III below.

I

The questions raised by the Director require the Court first to determine whether the issue presented here was preserved by timely presentation to the District Court. If it is held here that the matter was adjudicated in the District Court, the Director further contends that the District Court erred in its holding that the gain realized by the taxpayers as a result of the sales of timber by the partnership to the corporation in the years 1950, 1951, 1952, 1954 and 1955 was capital gain and not ordinary income.

The Belcher Land and Timber Company, called here the partnership, and the individual members comprising it, sought refunds for taxes which they claim were overpaid.

The partnership was formed on August 1, 1946. The W. A. Belcher Lumber Company, Inc., called here the corpora-tion, also commenced operations as of August 1, 1946. The ownership of the stock in the corporation is held by the same persons and in the same percentage as held by them in the partnership. W. A. Belcher has been the chief executive officer of both the partnership and the corporation since their inception.

In the years 1950 through 1955 the partnership bought and sold real estate and lumber. The following reflects the yearly purchases of timber by the partnership in the years 1950 through 1955:

|      | Number of Purchases | Footage (Board Feet) |
|------|---------------------|----------------------|
| 1950 | 16                  | 5,838,194            |
| 1951 | 25                  | 10,555,212           |
| 1952 | 49                  | 4,779,899            |
| 1953 | 59                  | 8,895,923            |
| 1954 | 46                  | 20,611,667           |
| 1955 | 42                  | 16,349,296           |

The corporation purchased timber from the partnership and manufactured it into lumber.

The timber was cut by the corporation pursuant to a loose oral arrangement or understanding between the partnership and the corporation. This arrangement was in the nature of a continuing offer by the partnership for the sale of its timber. The corporation accepted these continuing offers as a matter of course and cut the timber from the land owned or leased by the partnership. The partnership received payment from the corporation measured by the fair market value of the timber cut. The following reflects the partnership sales to the corporation for the years 1950 through 1955:

|       | Price Paid by Corporation | Footage (Board Feet) |
|-------|---------------------------|----------------------|
| 1950  | $ 369,432.27              | 15.4 million         |
| 1951  | 522,895.53                | 15.1 million         |
| 1952  | 495,257.06                | 14.4 million         |
| 1953  | 419,411.36                | 16.1 million         |
| 1954  | 252,678.20                | 12.2 million         |
| 1955  | 512,222.71                | 16.5 million         |
| Total | $2,152,485.77             |                      |

In addition to the sales made to the corporation, the partnership made sales to other customers as follows:

|  | Timber Held by Partnership for More Than 6 Mos. | Timber Held by Partnership for Less than 6 Mos. |
| --- | --- | --- |
| 1950 | $ 2,148.45 | $ —0— |
| 1951 | 2,196.69 | —0— |
| 1952 | 3,552.32 | —0— |
| 1953 | —0— | —0— |
| 1954 | —0— | 7,735.00 |
| 1955 | 13,680.00 | 2,739.05 |
| Total | $21,577.46 | $10,474.05 |

In its tax returns for the years 1950 through 1955 the partnership accorded the gain from the sales of timber capital gain treatment. The individual members of the partnership treated their respective distributive shares of the gain from sales of timber in their individual tax returns as capital gains. The timber sold by the partnership was partly timber which stood on lands owned by the partnership and was partly timber standing on land owned by others on which the partnership had a lease or contractual right to cut.

The partnership returns were audited by the Internal Revenue Service and a finding made of deficiencies in taxes for each of the partners for all of the years 1950 through 1955, inclusive. The year 1953 is the subject matter of pending litigation in the Tax Court and is not involved here. The partners paid the assessed deficiencies and filed claims for refund. Upon rejection of these claims, the instant actions were filed and consolidated for trial.

On September 22, 1960, prior to the trial, the Director filed a motion for set-off, urging that neither the partnership nor the individual partners were entitled to capital gain treatment on the partnership sales of timber because: (1) the partnership was engaged, among other things, in the business of selling logs and timber to customers in the ordinary course of its trade or business; (2) the agents of the Internal Revenue Service incorrectly assumed that the sales of timber held by the partnership constituted gain from the sale of a capital asset held for more than six months under the provisions of Section 117(k) (2) of the 1939 Internal Revenue Code, 26 U. S.C.A. § 117(k) (2) and Section 631(b) of the 1954 Code, 26 U.S.C.A. § 631(b). The Director discovered that there was not a "disposal of timber" with retained economic interest as required in these sections, and, in addition, found that some of the logs and timber sold was not held, as required, for more than six months prior to disposal. (3) Neither the partners nor the partnership elected to come under the provisions of Section 117(k) (1) of the 1939 Code or Section 631(a) of the 1954 Code. Therefore, the Director says, the timber held by the partnership was its stock in trade, so to speak, and was, accordingly, held primarily for sale to customers in the ordinary course of its trade or business. If this be so, it follows that the gain from these sales of timber should have been reported and taxed as ordinary income rather than capital gain.

The partnership contends that the issue of whether the timber held by the partnership was held primarily for sale to customers in the ordinary course of its trade or business was not raised in the court below and, therefore, is not properly before this Court for determination on appeal.

The partnership's position is that the instruction given by the court to the jury at the request of the Director is the law of the case;[1] that the pre-trial order as

---

1. *Defendant's Requested Instruction No. 4*

" * * * You will notice from the questions I am going to hand to you to take into the jury room that you are asked to determine the fair market value of timber held for six months or less and for timber held for more than six months. This separation is important because the tax treatment is different. Timber held for more than six months is subject to the capital gains tax while

well as the testimony of the witnesses show that this issue had not been previously raised and the attempt by the Director to raise the issue on this appeal is improper. It contends that the Revenue Agent's report on which claim for refund is predicated failed to raise this issue and this report being presumptively correct, the Director is precluded from raising the issue.

In its findings of fact, however, the District Court specifically found that the sales of timber made for each of the years 1950 through 1955 by the partnership to the corporation were *not* made of property held primarily for sale to customers in the ordinary course of the trade or business of the partnership. In its conclusions of law the court held that the gain from sales of timber made by the partnership to the corporation during each of the five years involved here were entitled to capital gain treatment under the Internal Revenue Code.

By agreement of the parties only a few of the many factual issues presented were submitted to the jury, all others being left to the trial court for determination. Since the court found that the sales were not made of property held primarily for sale to customers in the ordinary course of trade or business, the subsequent interrogatories submitted to the jury distinguishing long term gains from short term gains necessarily followed. We hold that the issue was properly raised and adjudicated below and is, therefore, properly before this Court.

The Director urges that the finding of fact made by the District Court was erroneous. Since there is no basic disagreement as to the evidentiary facts, the Director's objections to the finding may be weighed here free from the restraint of the "clearly erroneous rule" to determine whether the District Court erred in its ultimate finding of fact that the sales of timber made by the partnership were not made of property held primarily for sale to customers in the ordinary course of trade or business. Thomas v. Commissioner, 254 F.2d 233 (5th Cir. 1958); Gamble v. Commissioner, 242 F.2d 586 (5th Cir. 1957); Galena Oaks Corp. v. Scofield, 218 F.2d 217 (5th Cir. 1954).

Gains from the sale of timber constitute capital gain and are given favorable capital gain treatment if the timber is a "capital asset" as defined by Section 117 (a) (1) and (4) of the 1939 Code;[2] or if the transactions whereby the gain is realized comply with the specific terms of Section 117(k) (1) or (2).[3]

timber held for six months or less before the cutting date is subject to ordinary income tax rates. Therefore your answers will separate the two for each of the years in question. This means that you must first determine which timber was held for more than six months before cutting and which was held for six months or less. After separating the two, you must determine the fair market value of each upon the cutting date."

2. "§ 117. Capital gains and losses.
"(a) Definitions. As used in this chapter—
"(1) Capital assets. The term 'capital assets' means property held by the taxpayer (whether or not connected with his trade or business), but does not include—
"(A) stock in trade of the taxpayer or other property of a kind which would properly be included in the inventory of the taxpayer if on hand at the close of the taxable year, or property held by the

taxpayer primarily for sale to customers in the ordinary course of his trade or business. * * *
"(4) Long-term capital gain. The term 'long-term capital gain' means gain from the sale or exchange of a capital asset held for more than 6 months, if and to the extent such gain is taken into account in computing gross income. * * *"

3. (k) (As added by Sec. 127(a), Revenue Act of 1943, supra, and as amended by Sec. 325(b) and (c), Revenue Act of 1951, supra)
"Gain or loss in the Case of Timber or Coal.—
"(1) If the taxpayer so elects upon his return for a taxable year, the cutting of timber (for sale or for use in the taxpayer's trade or business) during such year by the taxpayer who owns, or has a contract right to cut, such timber (providing he has owned such timber or has held such contract right for a period of

Section 117(a) (1) defines "capital assets" as "property held by the taxpayer (whether or not connected with his trade or business), but does not include * * property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business. * * * "

Section 117(k) (1) provides that the actual cutting of timber by a taxpayer who owns or has a contractual right to cut shall be considered, *if the taxpayer so elects,* as a sale or exchange of the timber and the gain resulting therefrom shall be given capital gain treatment. We find that Section 117(k) (2) is inapplicable here since there was no "disposal" of timber under a "contract by virtue of which the owner retains an economic interest in such timber." See Jantzer v. Commissioner, 284 F.2d 348 (9th Cir. 1960). The appellees assert no rights under Sections 117(k) (1) or 117(k) (2), therefore no discussion is deemed necessary.

The evidence of record establishes that the partnership was primarily in the business of selling timber. W. A. Belcher, the chief executive officer of the partnership and the corporation, testified to this fact.[4]

In the partnership Form 1065 tax returns for each of the years in question, it is asserted that the principal activity of the partnership was "real estate and timber". The partnership's ledgers (Plaintiff's Exhibit 11) reveals a long history of constant, continuous and substantial timber sales throughout the years 1950 through 1955.

more than six months prior to the beginning of such year) shall be considered as a sale or exchange of such timber cut during such year. * * *

"(2) In the case of the disposal of timber or coal (including lignite), held for more than 6 months prior to such disposal, by the owner thereof under any form or type of contract by virtue of which the owner retains an economic interest in such timber or coal, the difference between the amount received for such timber or coal and the adjusted depletion basis thereof shall be considered as though it were a gain or loss, as the case may be, upon the sale of such timber or coal. * * * "

"§ 631. [Internal Revenue Code of 1954.] Gain or loss in the case of timber or coal.

"(a) Election to consider cutting as sale or exchange.—If the taxpayer so elects on his return for a taxable year, the cutting of timber (for sale or for use in the taxpayer's trade or business) during such year by the taxpayer who owns, or has a contract right to cut, such timber (providing he has owned such timber or has held such contract right for a period of more than 6 months before the beginning of such year) shall be considered as a sale or exchange of such timber cut during such year. * * *

"(b) Disposal of timber with a retained economic interest.—In the case of the disposal of timber held for more than 6 months before such disposal, by the owner thereof under any form or type of contract by virtue of which such owner retains an economic interest in such timber,

the difference between the amount realized from the disposal of such timber and the adjusted depletion basis thereof, shall be considered as though it were a gain or loss, as the case may be, on the sale of such timber. * * * For purposes of this subsection, the term 'owner' means any person who owns an interest in such timber, including a sublessor and a holder of a contract to cut timber."

4. CROSS EXAMINATION

"Q (BY MR. FRAZIER:) Mr. Belcher, I believe you testified a moment ago that you are a lumber manufacturer. You have got several other businesses, too?

"A Yes, I have got a few other things.

"Q You are the President of the Land & Timber Company, aren't you?

"A President.

"Q President?

"A I am joint owner and manager.

"Q Of the land and timber company?

"A Right.

"Q You are the chief executive officer?

"A I am General Manager.

"Q About the corporation, the lumber company?

"A I am President.

"Q That is the same office generally as Chief Executive. Now what is the land and timber company? It, as I understand it buys the land and timber and turns around and sells it to the corporation?

"A To the lumber company.

"Q And the lumber company cuts it up into boards and pays what you consider to be the fair market value?

"A Right."

Under the headings set forth in the ledgers one section is devoted to the sales of timber made to the corporation and the other to sales made to other customers.

The partnership sold over 80 million board feet of timber to the corporation in the six year period. The sales ranged from a minimum of something under 9 million board feet in the year 1953 to a maximum of 19 million board feet in the year 1954. The sales were numerous and the ledger shows that the partnership billed the corporation for timber sold as frequently as bi-monthly. In the six year period the partnership received a total of $2,152,485.77. Although not in so great a quantity, there were sales to other customers. During the six year period in question, the partnership received total income in sales to other customers in the amount of $32,051.51.

The partnership made continuous, numerous and frequent purchases of standing timber. These purchases consisted of both land purchases as well as lease or contract rights to cut timber standing on land belonging to others. A total of 237 separate standing timber purchases were made from 1950 through 1955, ranging from a minimum of 16 purchases in any one year to a maximum of 59 purchases. In addition to the timber which it already owned, the partnership acquired as a result of these purchases approximately 65 million board feet of standing timber over the six year period. Virtually all of the timber was cut within one year after it had been acquired. All of the timber was cut by the partnership's customers. Of the timber held in excess of six months the partnership netted $861,467.22.

On the basis of the foregoing facts, if the sales of timber made by the partnership did not consist of timber held primarily for sale to customers in the ordinary course of trade or business, it is difficult to conceive for what other purpose the timber was held. The fact that most of the timber was sold to the corporation does not alter the fact that the primary business of the partnership was selling timber. There is nothing in the statute to provide that sales to a restricted number of customers are not to be considered as sales to customers. Pennroad Corp. v. Commissioner, 261 F. 2d 325 (3rd Cir. 1958), certiorari denied 359 U.S. 958, 79 S.Ct. 797, 3 L.Ed.2d 766. A single vendee may be a customer within the meaning of Section 117(a) (1). Jantzer v. Commissioner, supra.

We, therefore, hold that the District Court erred in its ultimate determination that the sale of timber for the years in question were not of property held primarily for sale to customers in the ordinary course of trade or business. It therefore follows that we do not agree that the sales of timber constituted sales of "capital assets" under Section 117(a) (1).

The judgment is therefore vacated and the cause remanded to the District Court with directions for the entry of judgment in accordance herewith.

## II

The second question raised in the Director's appeal is whether the District Court erred in refusing to make a determination of the specific year in which the Allendale tract of land became a taxable event to the partnership.

In 1950 the partnership sold the bulk of a property known as the Allendale tract to the Atlanta Highway Estates, Inc. The total price of the property sold by the partnership was $727,200. The vendee paid $53,236 in cash and gave a purchase money mortgage for the remaining balance of $673,964. In 1953 as a result of the default by Atlanta Highway Estates, Inc., the partnership foreclosed on the mortgaged property. At public auction on February 14, 1953, the partnership bid in the property at $500,-000 and on that date reacquired the property through deed of foreclosure.

Beginning in January, 1954, and continuing through 1955 the partnership resold the repossessed property in small parcels and lots. Although the gain upon the foreclosure was not reported by the partnership, the partnership in-

creased the cost basis of the property by the amount of the price bid in at the foreclosure. It thereby subsequently computed its gain on the sales of the small parcels and lots using the increased basis of the property. As a result thereof it reported a smaller gain from the sale of these parcels and lots.

The Director determined in its notice of deficiency that the gain realized on the foreclosure sale should have been reported in the partnership income for the year 1953. Income tax adjustments for the year 1953 are now in the Tax Court upon petition for redetermination filed by the taxpayer.

The District Court during the course of the trial ruled that the gain realized from the foreclosure sale was a taxable event, but there was no ruling as to the taxable year. At the close of the trial the Director discovered that the taxpayers were urging in the Tax Court that the foreclosure sale was a taxable event in 1954 or 1955 on the ground that the two year statutory right of redemption was not relinquished until July 26, 1954. Upon discovery of the fact that the taxpayers denied that the foreclosure was a taxable event in 1953, the Director moved the District Court to determine the specific year that the gain on the foreclosure sale constituted a taxable event. The District Court declined to do so, stating as grounds for its refusal that "neither party is hereby estopped or in any wise precluded in any other litigation or proceeding from litigating the issue of the proper year in which any gain from the foreclosure is taxable."

We think that the District Court's refusal to make a determination of the specific year in which the gain constituted a taxable event was error, for in order for there to be a final disposition of this litigation such determination is indispensable. The taxable consequences of this determination should likewise be settled in this litigation.

■ The taxpayer is not entitled to a refund for the years in which he claims such refunds are due if he still owes taxes for the years involved. The Director is entitled to set off any monies still owing to the Government against the amounts claimed for refund. See Lewis v. Reynolds, 48 F.2d 515 (10th Cir. 1931), affirmed 284 U.S. 281, 52 S.Ct. 145, 76 L. Ed. 293.

■ Once the year of the taxable event is established, the taxable consequences follow as a matter of course. If the gain from the foreclosure is a taxable event of the year 1953, then the Director would have no right of set-off in *this* litigation as distinguished from other claims for refund asserted by the taxpayer in the Tax Court. If the gain is a taxable event in the year 1954 or 1955, the partners or partnership would not be entitled to as much of a refund as they now lay claim to. A new suit should not be required merely for the purpose of making this determination.

A plenary proceeding involving the same testimony, the same exhibits, the same parties and the same subject matter is a useless procedure and can only increase the costs of litigation and prolong the matter unduly. We think that the District Court should make this determination from the record as it stands, or if either of the parties desire to submit additional relevant evidence the District Court should receive it and thereafter enter appropriate findings of fact and conclusions of law.

Reversed and remanded with directions for further proceedings in accordance herewith.

### III

This portion of the opinion is devoted to the appeal of Mary Belcher Abernathy and James R. Abernathy, Jr. They contend that the District Court erred in refusing to grant a directed verdict on the question of whether the Allendale tract was held primarily for sale to customers in the ordinary course of trade or business for the years 1954 and 1955.

The jury found that the Allendale tract was held primarily for sale to customers in the ordinary course of trade or business in 1954 and 1955. We must, there-

fore, determine the sufficiency of the evidence to support the verdict. The jury answered a special interrogatory as follows:

"Was the 'Allendale' tract held primarily for sale to customers in the ordinary course of trade or business of the partnership:

During the year 1950? — No — (Yes or No)
During the year 1951? — No — (Yes or No)
During the year 1952? — No — (Yes or No)
During the year 1954? —Yes — (Yes or No)
During the year 1955? —Yes — (Yes or No)"

In 1943 Mary Belcher Abernathy, here referred to as the taxpayer, was a partner along with other members of the Belcher family in the W. A. Belcher Lumber Company.

In 1943 the partnership purchased a 699.47 acre tract of land known as the Allendale tract. At the time the purchase was made, part of the property had been subdivided and streets and utilities were installed but not all of the lots had been sold. The W. A. Belcher Lumber Company sold lots from the Allendale tract through a real estate man at Fairfield.

On August 1, 1946, the W. A. Belcher Lumber Company was dissolved and the Belcher Land and Timber Company, a partnership, was formed. The Allendale tract along with other assets of the W. A. Belcher Lumber Company was transferred to the new partnership. At this time the Allendale property was reduced to 691.476 acres.

The partnership thereafter conducted the sales of the lots. The partnership returns show that the partnership made sales from the Allendale tract (excluding the installment sale to the Atlanta Highway Estates in 1950, referred to in II, supra) in the number of sales, acreage, gross sales price and total gain in the years 1946 through 1955 as listed below:

|      | Number of Sales | Acres Sold | Gross Sales Price | Total Gain |
|------|-----------------|------------|-------------------|------------|
| 1946 | 1 | —— | $ 53,490.00 | $ 6,455.56 |
| 1947 | 0 | —— | —— | —— |
| 1948 | 2 | 13.5 and a lot 200' x 300' | 10,750.00 | 3,200.00 |
| 1949 | 2 | 21.59 | 15,590.00 | 6,686.00 |
| 1950 | 3 | 27.756 | 87,024.00 | 73,970.00 |
| 1951 | 2 | 7.1074 | 28,420.00 | 24,155.50 |
| 1952 | 1 | —— | 1,000.00 | 2,500.00 |
| 1953 | 1 | —— | 31,800.00 | 27,030.00 |
| 1954 | 9 | —— | 41,510.00 | 10,760.00 |
| 1955 | 5 | —— | 257,090.50 | 57,470.50 |

In its returns for these years the partnership treated the gain from the above sales as long term capital gain. The individual taxpayers treated their respective distributive shares from the sale of Allendale property as long term capital gains.

The partnership's returns show that on July 15, 1950, the partnership sold 581.76 acres of the Allendale tract to the Atlanta Highway Estates, Inc., for $727,200 and for the three years prior to default the total collections, including the down payment, totaled $124,439.95. Of these collections $106,831.71 was reported as profit and the balance, $17,608.24, was treated as a return of capital.

In 1953 when the partnership foreclosed on 445.46 acres of the Allendale tract, the partnership bid in the property at $500,000 and acquired deed thereto.

On July 26, 1954, the Atlanta Highway Estates, Inc., relinquished its statutory right of redemption by quit claim deed. All of the sales from the Allendale tract listed by the partnership in its returns for the years 1954 and 1955 were from the repossessed property.

Some of the sales from the Allendale tract were to Belcher Building Corporation. This corporation was formed in 1946 to develop land, to build houses for sale, and to otherwise deal in real estate. At the outset W. A. Belcher and one W. E. Armstrong each owned one-third of the stock and E. C. Creel and the Creel Investment Company, Inc., owned the remaining one-third.

In 1954 W. A. Belcher and Nell Vandergrift Belcher, his wife, acquired all of the stock formerly held by Armstrong, Creel and Creel Investment Company, and thereby acquired complete ownership of the Belcher Building Corporation. A qualifying share thereafter issued to Mrs. N. O. Vandergrift. W. A. Belcher, Nell Vandergrift Belcher and Mrs. N. O. Vandergrift became the Board of Directors. The Belcher Building Corporation never profited.[5]

The General Manager of the Belcher Building Corporation testified that he knew he was working solely for Mr. Belcher in the years 1954 and 1955. In these years he developed and subdivided raw acreage from the repossessed Allendale tract for resale through the Belcher Building Corporation. The acreage was actually purchased by the Building Corporation in 1955, but the planning and developing began in 1954. In the years 1954 and 1955 lots from the Allendale tract were sold directly to the public on behalf of the partnership.

The Director in the deficiency notice determined that the lots in the Allendale tract were held primarily for sale to customers in the ordinary course of trade or business of the partnership, and that the profit realized on sales from the property on that tract was ordinary income rather than long term capital gain as reported on the partnership return. Assessments of the deficiencies for the years 1950, 1951, 1952, 1954 and 1955 were timely made.

■ This issue was tried before a jury and the jury determined that in 1954 and 1955 the partnership held the lots in the Allendale tract primarily for sale to customers in its ordinary course of trade or business. The jury's verdict in the instant case not only has a rational basis in the evidence, but is firmly grounded in the facts of record.

In 1954 alone the partnership made nine separate sales of lots from the reacquired tract of land.

■ It has been uniformly held that the question of particular property held primarily for sale to customers in the ordinary course of business is essentially a question of fact to be determined by the trier of fact. Gamble v. Commissioner, supra; Jackson v. King, 223 F.2d 714 (5th Cir. 1955); Galena Oaks Corp. v. Scofield, supra.

■ Where a jury has tried a matter upon correct instructions, the only inquiry is whether such conclusion could with reason be reached on the evidence. Commissioner v. Duberstein, 363 U.S. 278, 80 S.Ct. 1190, 4 L.Ed.2d 1218; United States v. Kaiser, 363 U.S. 299, 80 S.Ct. 1204, 4 L.Ed.2d 1233 (1960).

The taxpayers' contention that the property was originally purchased in 1943 as an investment is not persuasive of its subsequent intent and use after reacquisition in the mortgage foreclosure. While property may at one time be held for investment purposes, if the character of the business changes or the intent of the partners changes, the property could subsequently be found by reasonable men

| 5. | Net Sales | Net Income (or Loss) |
|---|---|---|
| 1946 | $562,000.00 | $ 1,853.16 |
| 1947 | 80,000.00 | (3,000.00) |
| 1950 | 289,431.00 | —0— |

| 1951 | 524,000.00 | 811.00 |
|---|---|---|
| 1952 | 350,000.00 | (4,400.00) |
| 1953 | —0— | (193.00) |
| 1954 | —0— | —0— |
| 1955 | —0— | (10,000.00) |

**298**

to be held primarily for sale to customers in the ordinary course of business.

We think that the verdict of the jury is clearly sustainable upon the evidence and we affirm the District Court's denial of the motion for directed verdict.

Affirmed in part.

Reversed in part with directions.