313 F.2d 710
 63-1 USTC P 9145
 UNITED STATES of America, Appellant,
v.
Erminio GIUSTINA and Irene O. Giustina, Appellees.
UNITED STATES of America, Appellant,
v.
Anselmo GIUSTINA and Josephine Giustina, Appellees.
UNITED STATES of America, Appellant,
v.
Natale B. GIUSTINA and Jacqueline Giustina, Appellees.
UNITED STATES of America, Appellant,
v.
Ehrman V. GIUSTINA and Marion Lee Giustina, Appellees.
 Nos. 17454-17457.
 United States Court of Appeals Ninth Circuit.
 Dec. 17, 1962, Rehearing Denied Jan. 29, 1963.
 
 Dougherty & Cairns, and William E. Dougherty, Portland, Or., for appellee.
 Louis F. Oberdorfer, Asst. Atty. Gen., Lee A. Jackson, Robert N. Anderson and Dale E. Anderson, Attorneys, Department of Justice, washington, D.C., and Sidney I Lezak, U.S. Atty., and Edward J. Georgeff, Asst U.S. Atty., Portland, Or., for appellant.
 Before HAMLIN, JERTBERG and BROWNING, Circuit Judges.
 BROWNING, Circuit Judge.
 
 
 1
 Appellees' partnership entered into a 'Timber Sale Agreement' with the United States Forest Service with respect to the timber on one hundred ninety acres of government land. The timber was ultimately cut and removed by a corporation pursuant to a contract with the partnership. In their income tax returns the partners reported payments received from the corporation as capital gains. The Commissioner of Internal Revenue determined that these receipts were taxable as ordinary income; appellees paid the additional tax and sued to recover. The District Court entered judgment for the taxpayers and the government appealed.
 
 
 2
 The taxpayers are entitled to prevail if the receipts arose from a 'disposal of timber * * * held for more than 6 months prior to such disposal, by the owner thereof under any form or type of contract by virtue of which the owner retains an economic interest in such timber * * *.' Internal Revenue Code of 1939, Section 117(k)(2).[1]
 
 
 3
 The government contends that: (1) the partnership did not become the 'owner' of the timber under the Timber Sale Agreement with the Forest Service; (2) the arrangement between the partnership and the corporation did not constitute a 'disposal' of the timber under a binding 'contract,' and (3) the partnership did not hold the timber for the required six months.
 
 
 4
 1. The term 'owner' of timber was not defined in Subsection 117(k)(2) as the time relevant here.[2] However, in view of the purposes of the subsection, the term must be read to include at least those persons having a beneficial interest and investment risk in the standing timber. We turn to the contract between the government and the partnership to determine whether the latter acquired such an interest.
 
 
 5
 The Timber Sale Agreement provided[3] for the 'purchase'[4] by the partnership of all timber merchantable for saw logs within a designated area. The purchase price was stated in terms of dollars per thousand board feet of timber, payable in advance of cutting as called for by the Forest Officer in charge. The partnership was required to cut and remove the timber by a fixed date; timber subject to the contract which was uncut by that date, or cut but not removed, was nonetheless to be paid for.[5]
 
 
 6
 Thus the agreement related to specific timber, readily identified; the price was fixed, subject only to measurement and a simple calculation; the purchasers had both the right and the obligation to pay for, cut, and remove all of the designated timber from the seller's land, and to do so within a relatively short period; they were free to dispose of it as they chose. The fact that the amount due was to be computed by measuring the logs as felled and multiplying by the fixed unit figure, and that the total price was to be paid in installments as called for, did not diminish the risk assumed by the partners. The price lutimately to be paid did not depend upon whether the timber was cut, whether the logs were sold, or how much they brought.
 
 
 7
 Thus the purpose and effect of the Timber Sale Agreement was to commit the capital and credit of the partners to the acquisition of the timber and to transfer to the partners the beneficial interest and investment risk in it.[6] We are therefore satisfied that these partners fell within the class of persons to whom it must be supposed Congress intended to grant the preferential treatment provided by Subsection 117(k)(2); the District Court properly held that they were 'owners' of the timber within the meaning of the subsection.
 
 
 8
 In arguing that the partners were not 'owners' of the timber, the government relies upon certain decisions said to establish the rule that when an owner of oil and gas lands contracts with another for the exploitation of the oil and gas deposit in return for a percentage of the oil and gas produced, or its value, the owner has retained an 'economic interest' in the oil and gas in place and the contract is a 'lease' and not a 'sale' of the owner's capital interest in the underlying deposit.[7] The government argues that under the rational of these decisions the Timber Sale Agreement by which the partners acquired the timber is to be treated as a 'lease' and not a 'sale' and the partners as 'lessees' and not as 'owners' under Subsection 117(k)(2).[8]
 
 
 9
 But the Timber Sale Agreement was not a 'lease' under which the government retained as 'economic interest' in the timber within the meaning of the cases relied upon; hence they would not support the government in the present case even if we were to assume that a 'lessee' ad defined by these cases was necessarily excluded from the defeinition of 'owner' in Subsection 117(k)(2).[9] As these decisions point out, the typical contract for the exploitation of an oil and gas deposit does not have the characteristics of a sale of the owner's capital interest in the underlying oil and gas; its dominant purpose is the fix the terms under which the land will be explored and under which any deposit of oil and gas that may be found will be produced. The exploration, drilling, and production contemplated by such a contract resembles a manufacturing operation to which the passage of title to the oil and gas produced is only an incident, rather than a sale of an interest in the oil and gas in place. No oil and gas may be present at all. In any event, the quantity available or which may be produced is uncertain. Payments under such a contract depend upon the fact and the amount of production of the oil and gas. They represent the allocation to the owner of his share of the resource. Oil and gas not removed during the term of the contract normally remains the property of the lessor.
 
 
 10
 By contrast, the dominant purpose of the Timber Sale Agreement in the present case was not the lease of lands for exploration, discovery, and exploitation of a concealed resource over an extended term, but rather the immediate conveyance of a visible, measurable, readily accessible timber crop, to be paid for, cut, and removed within a short period of time. The money received by the government was not rental income for use of the lands or the distribution of a share of the value of the timber actually cut, but deferred payments of a fixed purchase price for a definite (though unmeasured) stand of timber. The governemt did not retain an economic interest in the timber transferred; the only 'interest' in the timber which it retained was the right to access after the timber was felled to make the measurements required to determine the amount due. The contract was not converted into a 'lease' merely because the purchase price was to be paid in installments computed by multiplying the number of units actually produced by a dollar figure fixed in the contract.[10]
 
 
 11
 2. We turn to the government's contention that the arrangement between the partnership and the corporation for the cutting and removal of the timber was not a 'disposal' of the timber under a 'contract' within the meaning of Subsection 117(k)(2).[11]
 
 
 12
 On July 1, 1948, the partnership entered into a contract to sell to the corporation one hundred and fifty million board feet of merchantable timber to be cut and removed from described parcels of land.[12] Initially the timber involved in the present suit was not included. By letter dated October 4, 1948, the partnership advised the corporation that the timber purchased by the partnership under the Forest Service Timber Sale Agreement would be made available to the corporation under the July 1, 1948 contract.[13]
 
 
 13
 The government first suggests that an agency relationship was created, relying upon a statement in the letter of October 4, 1948, from the partnership to the corporation that 'by cutting and removing the timber, you will act in effect as our agent, and you will be responsible to us for strict compliance with the terms of the Forest Service timber sale agreement.' But the contract of July 1, 1948 provided that 'the only relationship between Sellers and the Buyer shall be that of vendors and purchaser of said timber to be cut and removed from the lands of the Sellers as aforesaid, and the Buyer shall not in any respect be deemed to be or represent itself to be an agent of * * * the Sellers or any of them.' In context it is evident that the purpose of the letter of October 4th was to subject the timber purchased from the Forest Service to all of the terms and conditions of the July 1, 1948 contract; the statement in the letter of October 4th, emphasized by the government, was no more than an admonition that the terms of the Timber Sale Agreement must be faithfully complied with to avoid suspension of operations by the Forest Officer or termination of the Timber Sale Agreement by the government.
 
 
 14
 The government next suggests that the corporation assumed no binding obligation to the partnership under the arrangement. The District Court concluded that under the terms of the contract and letter 'the corporation was required to cut and remove the timber.' This seems a fair interpretation of the language used in the contractual documents and the government does not argue that it is not. But the government points out that the contract of July 1, 1948 purported to be a sale of a total of only one hundred and fifty million board feet of timber, and that if the 'estimated volume' figures set out in the exhibit to the contract are added together they total over one hundred and seventy-eight million board feet, indicating that more than enough timber to satisfy the contract had already been made available before the timber purchased from the Forest Service was added to the contract. The government argues that the obligations assumed by the corporation under the July 1, 1948 contract therefore did not in fact extend to the timber purchased from the Forest Service.
 
 
 15
 There is nothing to indicate that the estimates in the exhibit attached to the contract of July 1, 1948 were accurate or that the timber available under that contract, including the timber purchased from the Forest Service, actually totaled more than one hundred and fifty million board feet. But even if this were so, there is no reason why the parties could not agree to modify the original contract. It is clear that the partnership and the corporation intended that the timber purchased from the Forest Service should be subject to the July 1, 1948 contract and to the mutual obligations to sell and to buy imposed by the contract.[14]
 
 
 16
 3. The government's contention that the partnership did not hold the timber for the required six months is based upon the hypothesis that the timber was not acquired by the partnership until April 2, 1948, when the formal Timber Sale Agreement was executed by the Regional Forester, and that it was disposed of on September 10, 1948, when the first tree was felled by employees of the corporation.
 
 
 17
 There was evidence that a small amount of timber was cut by employees of the corporation between September 10th and October 4th. The District Court found that although 'there is some evidence that the corporation's logging superintendent started some cutting before any contractual arrangement was made between the partnership and the corporation * * * there is absolutely no evidence that there was any contract disposing of this timber prior to October 4.'[15] The District Court concluded that under the holding of this Court in Ah Pah Redwood Co. v. Commissioner,[16] such an arrangement was not a 'disposal' by 'contract' within the meaning of Subsection 117(k)(2), and that such a 'disposal' did not occur until the letter of October 4, 1948 was written. Appellees take the same position here, and renounce any claim that income from the sale of timber cut prior to October 4, 1948 would qualify for capital gains treatment under Subsection 117(k)(2).
 
 
 18
 There is no evidence that the oral arrangement in September purported to be a disposition of any timber other than the small amount actually cut and removed. Since the remaining timber concededly was not transferred to the corporation until the October 4th letter, it had been hald by the parthership for more than six months whether the partnership became the owner of the timber when its bid was accepted by the Forest Service on March 4, 1948 (as the District Court held) or when the Timber Sale Agreement was formally executed by the Regional Forester on April 2, 1948 (as appellant suggests).
 
 
 19
 Since the formal findings of the District Court indicate that capital gains may have been allowed with respect to income from timber cut between September 10th and October 4th, the judgment is vacated and the case remanded for any correction that may be required. The judgment is in other respects affirmed.
 
 
 
 [1]
 The tax years involved were 1949 and 1950
 
 
 [2]
 In the parallel provision of the 1954 Code, Congress provided that 'for purposes of this subsection, the term 'owner' means any person who owns an interest in such timber, including a sublessor and a holder of a contract to cut timber.' Int.Rev.Code of 1954, 631(b); 26 U.S.C.A. 631(b). The partners were 'owners' of the timber within this definition; however, as the government points out, this Court has held that the quoted provision of the 1954 Code modified the meaning of the term 'owner' and under the subsection as it read in the 1939 Code the term 'owner' did not extend to one who had a contract right to cut. Jantzer v. Commissioner, 284 F.2d 348, 356-357 (9th Cir., 1960). Compare 33 Taxes 336, 342 (1955); 30 Ore.L.Rev. 306, 317-18 (1951)
 
 
 [3]
 The more important provisions of the Timber Sale Agreement are set out in an Appendix B to the District Court's opinion. Giustina v. United States, 190 F.Supp. 303, 314-316 (D.Ore.1960)
 
 
 [4]
 Decisions bearing upon the significance of such words as 'sale,' 'purchaser,' and 'stumpage,' appearing in this contract, are reviewed in the opinion of the District Court. 190 F.Supp. at 307-313
 
 
 [5]
 The 'right, title, and interest' in such timber was to revert to the United States unless the timber was removed from the land within six months
 
 
 [6]
 Not all of the elements of the transaction pointed in one direction, but those that might indicate a retention of 'ownership' by the government were of relatively minor importance, or were referable to purposes other than that of allocating the risks and benefits of ownership. Thus the provision that title would not pass until the timber was 'paid for, felled and scaled, measured or counted' is a common means of securing an unpaid purchase price. See Wilson, 26 T.C. 474 (1956). See also S.R.A., Inc. v. Minnesota, 327 U.S. 558, 564-565, 66 S.Ct. 749, 90 L.Ed. 851 (1946). The right of assignment was restricted, but the qualification was only that the assignee be acceptable to the United States as a 'purchaser of timber.' The provision as to fire loss was partial and equivocal; it applied only to timber containing marketable material which was not designated for inclusion in the contract; as to this, loss fell upon the partners if they caused the fire or might have prevented it. This and other clauses of the contract regarding fire hazards, safety measures, logging practices, road building, and similar matters appeared to relate primarily to protection of the forests and lands from injury
 It would also appear that 'some of these were so-called 'boiler plate' provisions, such as are normally inserted as a matter of course in most contracts involving the cutting of timber * * * without too much thought being given to the question of whether such provisions are strictly necessary * * *.' (United States v. Johnson, 257 F.2d 530, 534 (9th Cir., 1958)), and are therefore of little value in determining the basic purpose of the parties.
 
 
 [7]
 The leading cases in the group are Burnet v. Harmel, 287 U.S. 103, 53 S.Ct. 74, 77 L.Ed. 199 (1932); and Palmer v. Bender, 287 U.S. 551, 53 S.Ct. 225, 77 L.Ed. 489 (1933). See generally Surrey & Warren, Federal Income Taxation 782-84 (1960). These cases held that royalty payments under contracts of the type involved were to be treated as ordinary income and not as receipts from the sale of a capital asset. Of course the government does not rely upon these cases to support and argument that the receipts of the partners from the corporation were ordinary income because the disposition of the timber by the partners to the corporation was a 'lease.' The very purpose of Subsection 117(k)(2) was to anticipate and reject just such a contention as applied to contracts disposing of timber in which the owner retains an economic interest in the timber itself. S.Rep. No. 627, 78th Cong., 1st Sess., pp. 25-26, 57-58. See 33 Taxes 336, 337-39 (1955); 24 Miss.L.J. 215, 217 (1953); 30 Ore.L.Rev. 306, 315 (1951). See also William J. Wineberg, 30 P-H Tax Ct.Mem. 1879 (1961); Lawton, 33 T.C. 47 (1959); Ray, 32 T.C. 1244 (1959), aff'd 283 F.2d 337 (5th Cir. 1960); Surrey & Warren, Federal Income Taxation 782-84 (1960). By the express mandate of the subsection such a disposition is a 'sale' for the purposes of capital gain treatment. The cases relied upon suggest only that a transferor who retained an economic interest in the deposit was not entitled to treat the proceeds of the transfer as capital gain. It does not follow that in such a case the transferee is not entitled to capital gains treatment of the proceeds if he disposes of his interest in otherwise appropriate circumstances. See Helvering v. Elbe Oil Land Dev. Co., 303 U.S. 372, 58 S.Ct. 621, 82 L.Ed. 904 (1938). Thus the cases relied upon by the government offer no support for the conclusion that a transferor (the Forest Service in this case) must not have retained an economic interest in the property transferred, and must be entitled to treat receipts from the transfer as capital gain, before its transferee (the partnership) may be treated as an 'owner' entitled to capital gains treatment of the proceeds of a subsequent transfer which otherwise meets the tests of Subsection 117(k)(2)
 
 
 [8]
 The government advances no reason, in terms of the purpose of the subsection, for the suggested approach to the definition of 'owner' under Subsection 117(k)(2)
 
 
 [9]
 See Island Creek Coal Co., 30 T.C. 370 (1958)
 
 
 [10]
 See Commissioner v. Remer, 260 F.2d 337 (8th Cir., 1958); Gowans v. Commissioner, 246 F.2d 448 (9th Cir., 1957); Baker v. Commissioner, 250 F.2d 195 (2d Cir., 1957); Crowell Land & Mineral Corp. v. Commissioner, 242 F.2d 864 (5th Cir., 1957); Dann, 30 T.C. 499 (1958). See also Anderson v. Helvering, 310 U.S. 404, 60 S.Ct. 952, 84 L.Ed. 1277 (1940); Helvering v. Elbe Oil Land Dev. Co., 303 U.S. 372, 58 S.Ct. 621, 82 L.Ed. 904 (1938); Linehan v. Commissioner, 297 F.2d 276 (1st Cir., 1961); William J. Wineberg, 30 P-H Tax Ct.Mem. 1879 (1961)
 
 
 [11]
 The government concedes that by virtue of this arrangement the partnership retained an 'economic interest' in the timber within the meaning of Subsection 117(k)(2). The price to be paid the partnership for the timber was dependent upon the amount which the corporation realized from the timber after severance, excluding any element of profit from either the logging operation or the manufacture of lumber from the timber. It thus met the most exacting standards applied in determining whether an economic interest has been retained in a transfer of property for the purposes of depletion allowance. There is no reason for applying a more stringent standard when the question is whether a transferor of timber is entitled to the benefits of Subsection 117(k)(2). The fact that an economic interest is retained in disposing of timber is not the reason for granting capital gains treatment; on the contrary, as we have seen (n. 7) the purpose of Congress was to avoid the very real possibility that the courts might hold that retention of such an interest required a denial of capital gains treatment
 
 
 [12]
 Excerpts from this contract are set out in Appendix C to the District Court's opinion. 190 F.Supp. at 316
 
 
 [13]
 The letter is reproduced as Appendix D to the District Court's opinion. 190 F.Supp. at 316-317
 
 
 [14]
 There is a substantial basis for inferring an agreement that the timber purchased from the Forest Service was to be among the first cut under the July 1, 1948 contract; the latter contract was to run for ten years and if the timber purchased under the Timber Sale Agreement with the Forest Service were not cut and removed by December 31, 1949 (later extended to September 30, 1950) it would be lost. See A. F. Lowes Lumber Co., 29 P-H Tax Ct.Mem. 808 (1960)
 
 
 [15]
 ,190 F.Supp. at 313
 
 
 [16]
 251 F.2d 163 (9th Cir., 1957)