GEORGIA–PACIFIC CORPORATION, Plaintiff-Appellant,

v.

UNITED STATES of America, Defendant-Appellee.

No. 79–4039.

United States Court of Appeals, Ninth Circuit.

Argued Nov. 5, 1981.

Submitted March 19, 1981.

Decided June 18, 1981.

Maurice O. Georges (argued), David C. Culpepper, Portland, Or., on brief, for plaintiff-appellant.

David E. Carmack, Washington, D. C., for defendant-appellee; John F. Murray, Acting Asst. Atty. Gen., Gilbert E. Andrews, Washington, D. C., on brief.

Before HUG and REINHARDT, Circuit Judges, and TAYLOR,* District Judge.

HUG, Circuit Judge:

Georgia-Pacific Corp. appeals from the dismissal of its tax refund suit. Georgia-Pacific claimed that it was entitled under Int.Rev.Code § 631(b) to long-term capital gains treatment on the sale of standing timber. The district court held that under Treas.Reg. § 1.1502–13(c)(4), governing affiliated corporations filing consolidated tax returns, Georgia-Pacific was required to treat the gain as ordinary income. Georgia-Pacific contends on appeal that the regulation is not applicable because the transaction was not a "deferred intercompany transaction" and the purchaser was not entitled to claim depletion when the timber was cut. We affirm.

### I. Facts

In 1973, Georgia-Pacific Corp. entered into a timber-cutting contract with its wholly-owned subsidiary, Timber, Inc. (Timber), under which Timber agreed to cut a fixed amount of standing timber on certain lands owned by Georgia-Pacific for $150 per thousand board feet. The contract refers to Georgia-Pacific as the "seller" and Timber as the "buyer." Payment is required upon removal of the timber and title passes from seller to buyer upon payment. The contract does not specify which party bears the risk of loss prior to payment, except that the buyer is liable for trees injured by its own negligence. The contract prohibits assignment of the buyer's rights. Georgia-Pacific also entered into a similar contract with another wholly-owned subsidiary, Rex Timber Corp. (Rex), whereby Georgia-Pacific agreed to cut timber on land owned by Rex. This contract is identical to the Georgia-Pacific/Timber contract except that it expressly specifies that the seller bears the risk of loss and provides that the price per board foot is to be readjusted annually to reflect market value. Because the contracts are virtually identical, in our discussion of the case we will refer to the Georgia-Pacific/Timber contract with the understanding that the same logic applies to the Rex/Georgia-Pacific contract.

Georgia-Pacific, Timber, and Rex filed a consolidated tax return for 1973 in which they claimed capital gains treatment under Int.Rev.Code § 631(b) for the payments received under the contracts. The IRS issued a notice of deficiency for $332,472 on the theory that the gain must be treated as ordinary income under Treas.Reg. § 1.1502–13(c)(4). Georgia-Pacific paid the disputed tax and sued for a refund in the district court. The district court dismissed for failure to state a claim upon which relief could be granted.

### II. Statutory Framework

Int.Rev.Code § 631(b) provides that the disposition of standing timber held for a specified period pursuant to a contract under which the owner retains an economic interest in the timber shall be treated for tax purposes as a gain or loss.[1] Under

---

* The Honorable Fred M. Taylor, Senior United States District Judge, District of Idaho, sitting by designation.

1. In 1973, Int.Rev.Code § 631(b) provided:
   *Disposal of timber with a retained economic interest.*—In the case of the disposal of

Int.Rev.Code § 1231(b) the gain on such a transaction is treated as a long-term capital gain. Treas.Reg. § 1.631–2(a)(2). The IRS does not dispute that the transaction between Georgia-Pacific and Timber qualifies under § 631(b).

Int.Rev.Code § 1501 provides that an "affiliated group"[2] of corporations may file a consolidated return. Such a return allows the losses of one corporation to be offset against the income of the other affiliated corporations. It is not disputed that the corporations here are an affiliated group entitled to file a consolidated return.

Section 1502 authorizes the Commissioner to promulgate regulations for corporations using consolidated returns "to prevent avoidance of . . . tax liability." The regulations under section 1502 provide that transactions between affiliated corporations filing consolidated returns are generally to be treated as if they were between unrelated taxpayers. Treas.Reg. § 1.1502–13(b)(1). Calculation and payment of tax is deferred, however, where the transaction is a sale or exchange of property or is an expenditure that must be capitalized. Treas.Reg. § 1.1502–13(a)(2). This transaction is called a "deferred intercompany transaction." The gain or loss on such a transaction is generally deferred until the asset is sold outside the affiliated group or the purchasing corporation leaves the affiliated group.[3] Treas.Reg. § 1.1502–13(c).

Section 1502 regulations also provide, however, that where property acquired by an affiliated corporation in a deferred intercompany transaction is subject to depreciation, depletion, or amortization, the gain is immediately taxable, Treas.Reg. § 1.1502–13(d)–(f), and is treated as ordinary income, Treas.Reg. § 1.1502–13(c)(4).[4] Georgia-Pa-

---

timber held for more than 6 months before such disposal, by the owner thereof under any form or type of contract by virtue of which such owner retains an economic interest in such timber, the difference between the amount realized from the disposal of such timber and the adjusted depletion basis thereof, shall be considered as though it were a gain or loss, as the case may be, on the sale of such timber. In determining the gross income, the adjusted gross income, or the taxable income of the lessee, the deductions allowable with respect to rents and royalties shall be determined without regard to the provisions of this subsection. The date of disposal of such timber shall be deemed to be the date such timber is cut, but if payment is made to the owner under the contract before such timber is cut the owner may elect to treat the date of such payment as the date of disposal of such timber. For purposes of this subsection, the term "owner" means any person who owns an interest in such timber, including a sublessor and a holder of a contract to cut timber.
The current version of § 631(b) provides for a holding period of one year, rather than six months.

**2.** "Affiliated corporations" are those in which 80% of the voting stock is owned by the parent corporation. Int.Rev.Code § 1504.

**3.** The deferral provision did not come into play in this case because the timber was sold outside the group in 1973 and Georgia-Pacific paid tax on the gain (at long-term capital gain rates).

**4.** Treas.Reg. § 1.1502–13 provides in relevant part:

(c)

. . . .

(4) *Character and source of deferred gain or loss.* (i) Except as provided in subdivision (ii) of this subparagraph, the character and source of deferred gain or loss on a deferred intercompany transaction shall be determined at the time of the deferred intercompany transaction as if such transaction had not occurred during a consolidated return year.

(ii) Deferred gain or loss taken into account by the selling member under paragraph (d)(1) of this section, or (as a result of abandonment) under paragraph (f) of this section, shall be treated as ordinary income or loss.

. . . .

(d) *Restoration of deferred gain or loss for property subject to depreciation, amortization, or depletion*—(1) *General rule.* (i) If property (including a capitalized expenditure for services, or any other capitalized expenditure) acquired in a deferred intercompany transaction is, in the hands of any member of the group, subject to depreciation, amortization, or depletion, then, for each taxable year (whether consolidated or separate) for which a depreciation, amortization, or depletion deduction is allowed to any member of the group with respect to such property, a portion (as determined under subdivision (ii) of this subparagraph) of the deferred gain or loss attributable to such property shall be taken into account by the selling member.

(ii) The portion of the deferred gain or loss attributable to any property which shall be

cific concedes that Treas.Reg. § 1.1502–13(c)(4) is valid and that, where applicable, it mandates ordinary income treatment of transactions otherwise qualifying for capital gains treatment under Int.Rev.Code § 631(b).

Section 611 of the Internal Revenue Code and the applicable regulations provide that owners of standing timber may deduct from their income a proportion of their basis in the timber to reflect depletion of their capital resource as the timber is cut. Because several parties are often involved in the purchase and cutting of standing timber, the regulations provide that only a party with an "economic interest" in the timber may take depletion as it is cut. Treas.Reg. § 1.611–1(b)(1).

### III. *Deferred Intercompany Transaction*

Georgia-Pacific first argues that the ordinary income provision of Treas.Reg. § 1.1502–13(c)(4) does not apply because the timber contracts do not qualify as deferred intercompany transactions. We do not agree.

A transaction between affiliated corporations will be deemed a deferred intercompany transaction if it constitutes:

(i) The sale or exchange of property,

(ii) The performance of services in a case where the amount of the expendi-

ture for such services is capitalized (for example, a builder's fee, architect's fee, or other similar cost which is included in the basis of property), or

(iii) Any other expenditure in a case where the amount of the expenditure is capitalized (for example, prepaid rent, or interest which is included in the basis of property)[.] ·

Treas.Reg. § 1.1502–13(a)(2).

█ We hold that the transactions in the present case were "sales" under the above-quoted regulation.[5] The timber contracts refer to the transaction as a "sale" and refer to the parties as the "buyer" and "seller." We are not inclined to ignore the taxpayer's characterization of the contracts. We hold *infra* that each of the purchasers acquired an "economic interest" in standing timber through the contracts that entitled it to claim depletion as the timber was cut. It is therefore appropriate to deem the transfer of this economic interest a "sale."[6]

Georgia-Pacific contends that a disposition of rights in standing timber that qualifies for capital gains treatment under Int. Rev.Code § 631(b) can never be deemed a sale. It first notes that the Supreme Court held that receipts from a mineral lease do not constitute the sale of mineral rights and are not entitled to capital gains treatment. *Burnet v. Harmel*, 287 U.S. 103, 53 S.Ct. 74,

---

taken into account by the selling member shall be an amount equal to—

(*a*) The amount of gain or loss deferred by the selling member at the time of the deferred intercompany transaction (and if a member has transferred the property to another member of the group, the remaining balance at the time of such transfer), multiplied by

(*b*) A fraction, the numerator of which is the amount of the depreciation, amortization, or depletion deduction with respect to such property allowed to any member of the group for the year (whether consolidated or separate), and the denominator of which is the depreciable basis (i. e., basis reduced by salvage value required to be taken into account, if any) of such property in the hands of such member immediately after such property was transferred to such member.

5. Although the district court found that the timber contracts were deferred intercompany transactions on the basis that they were re-

quired to be capitalized, see Treas.Reg. 1.1502–13(a)(2)(iii), we do not decide the case on that ground. We may affirm on any basis squarely presented by the record. *See Shipley v. United States*, 608 F.2d 770, 773–74 (9th Cir. 1979).

6. Treas.Reg. § 1.631–2(a)(1) provides that a disposition under § 631(b) constitutes a "sale." Georgia-Pacific argues that this regulation is invalid because it attempts to define how the transaction must be treated by the purchaser for tax purposes and is therefore inconsistent with the following proviso in 631(b):

In determining the gross income, the adjusted gross income, or the taxable income of the lessee, the deductions allowable with respect to rents and royalties shall be determined without regard to the provisions of this subsection.

Because we conclude on other grounds that the transaction was a sale, we need not address the validity of this regulation.

77 L.Ed. 199 (1932). Georgia-Pacific argues that, by analogy to *Burnet*, the disposition of rights in standing timber does not constitute a "sale" and that it is afforded capital gains treatment solely by virtue of Int.Rev. Code § 631(b). This argument is unpersuasive.

Assuming arguendo that the logic of *Burnet* also applies to the disposition of standing timber, we note that the Court held only that the lease did not constitute a sale of a *capital asset,* in that case the mineral rights in the land. The Court acknowledged that the lease did constitute a transfer of ownership of the minerals removed. *Id.* at 110–11, 53 S.Ct. at 77. Moreover, contracts for the sale of standing timber are more like a traditional sale than a mineral lease.

> [T]he typical contract for the exploitation of an oil and gas deposit does not have the characteristics of a sale of the owner's capital interest in the underlying oil and gas; its dominant purpose is to fix the terms under which the land will be explored and under which any deposit of oil and gas that may be found will be produced. The exploration, drilling, and production contemplated by such a contract resembles a manufacturing operation to which the passage of title to the oil and gas produced is only an incident, rather than a sale of an interest in the oil and gas in place. . . .

By contrast, the dominant purpose of the Timber Sale Agreement in the present case was not the lease of lands for exploration, discovery, and exploitation of a concealed resource over an extended term, but rather the immediate conveyance of a visible, measurable, readily accessible timber crop, to be paid for, cut, and removed within a short period of time.

*United States v. Giustina,* 313 F.2d 710, 714 (9th Cir. 1962).

Georgia-Pacific also argues that a transfer qualifying under section 631(b) can never be a "sale" because the disposing party retains an economic interest in the timber. This argument is also unpersuasive. The intent of Congress in enacting section 631 was to prevent application of the *Burnet* rationale to the sale of standing timber and to allow the owner of timber land capital gains treatment whether he sold the timber and the land or just the standing timber. *Dyalwood, Inc. v. United States,* 588 F.2d 467 (5th Cir. 1979); *United States v. Giustina,* 313 F.2d at 713 n.7, 714 n.11. We believe the section 631(b) phrase "under any form or type of contract by virtue of which such owner retains an economic interest" was merely a shorthand form to refer to the type of contract to which *Burnet* might otherwise be applied.[7]

## IV. *Timber Subject to Depletion*

Georgia-Pacific next argues that the ordinary income provisions of Treas.Reg. § 1.1502–13(c)(4) do not apply because the purchasers did not have an economic interest in the timber and consequently were not entitled to claim depletion as the timber was cut. We do not agree.

Because several parties may be involved in the growing, cutting, and marketing of timber, the IRS has promulgated regulations governing who may claim depletion. Annual depletion deductions are allowed only to the owner of an economic interest in mineral deposits or standing timber.

---

7. This view is reinforced by Treas.Reg. § 1.611–1(b)(2), which provides in part:

> No depletion deduction shall be allowed the owner with respect to any timber, coal, or domestic iron ore that such owner has disposed of under any form of contract by virtue of which he retains an economic interest in such timber, coal, or iron ore, if such disposal is considered a sale of timber, coal, or domestic iron ore under section 631(b) or (c).

Because only a party with an "economic interest" can claim depletion, and because the above-quoted regulation states that a party who disposes of timber under § 631(b) cannot claim depletion, the regulation suggests that a party who disposes of timber under § 631(b) transfers the real economic interest in the timber. *See* Part IV, *infra.* We think it is appropriate to call this transfer a "sale" and that "economic interest" is not used in § 631(b) in its technical sense with respect to who may claim depletion.

An economic interest is possessed in every case in which the taxpayer has acquired by investment any interest in mineral in place or standing timber and secures, by any form of legal relationship, income derived from the extraction of the mineral or severance of the timber, to which he must look for a return of his capital. But a person who has no capital investment in the mineral deposit or standing timber does not possess an economic interest merely because through a contractual relation he possesses a mere economic or pecuniary advantage derived from production. For example, an agreement between the owner of an economic interest and another entitling the latter to purchase or process the product upon production or entitling the latter to compensation for extraction or cutting does not convey a depletable economic interest

. . . .

Treas.Reg. § 1.611–1(b)(1) (1973).[8]

▮ Although the distinction between "economic interest" and "pecuniary advantage" in the quoted regulation is vague, judicial decisions have clarified the distinction. The Supreme Court has held that a mineral lessee has an economic interest in the minerals and is entitled to claim depletion if the lessee looks to the sale of the minerals in the open market for its return. *See Commissioner v. Southwest Exploration Co.,* 350 U.S. 308, 76 S.Ct. 395, 100 L.Ed. 347 (1956); *Palmer v. Bender,* 287 U.S. 551, 53 S.Ct. 225, 77 L.Ed. 489 (1933). Where the lessee is required to sell the minerals removed to the lessor at a predetermined price and does not look to the sale in the open market for its return, however, the lessee does not have an economic interest and may not claim depletion. *See Paragon Jewel Coal Co. v. Commissioner,* 380 U.S. 624, 85 S.Ct. 1207, 14 L.Ed.2d 116 (1965); *Parsons v. Smith,* 359 U.S. 215, 79 S.Ct. 656, 3 L.Ed.2d 747 (1959).

This court applied principles very similar to those employed by the Supreme Court in the above-cited cases in determining the nature of the purchaser's interest under a timber-cutting contract. *United States v. Giustina,* 313 F.2d at 712–13. There a taxpayer agreed to "purchase" standing timber under an agreement that called for the taxpayer to cut and remove a specific quantity of timber within a specific time period. The taxpayer was to pay a fixed price per board foot as the timber was cut, but would be liable for the entire amount due whether the trees were actually cut and removed or not. The purchaser's power to assign the contract and risk of loss in case of fire was limited. The taxpayer later sold its rights in the timber and claimed capital gains treatment under the predecessor of Int.Rev. Code § 631. The IRS contended that because the taxpayer was not the owner of the timber, it could not claim the benefits of the statute. The court held that the taxpayer was the owner because it had the right to sell the timber for its own account in the open market and thus possessed the investment opportunity and risk of ownership.

We conclude that the present case is controlled by *Giustina.*[9] As in *Giustina,* the

---

**8.** The 1973 regulation, upon which the parties rely, has been amended, but differs in no material respect from the current version.

**9.** In an earlier, similar case, *Jantzer v. Commissioner,* 284 F.2d 348 (9th Cir. 1960), this circuit upheld a decision of the Tax Court that the timber cutter was not the "owner" of the timber. The circuit court opinion noted that it was difficult to distinguish the *Jantzer* case from a prior case, *L. D. Wilson v. Commissioner,* 26 T.C. 474 (1956), in which the Tax Court had held that the timber cutter was the owner. The Tax Court's *Jantzer* decision was upheld on the basis that it was not clearly erroneous. The court implied that a decision that the timber cutter was the owner, consistent with the *Wilson* case, also would not have been clearly erroneous. 284 F.2d at 355.

Although the court did not expressly state in *Giustina* what standard of review it applied, it appears that it reviewed the question as one of law on which it made an independent determination. 313 F.2d at 712–14 & n.6. We need not determine the correct standard of review here, as we believe the judgment of the district court must be affirmed under either the independent determination or clearly erroneous test.

contracts at issue here provide for the purchase of a specified amount of timber at a predetermined price. The purchasers are thus able to sell the timber in the open market and possess the investment opportunity and risk of ownership. Although the Rex/Georgia-Pacific contract provides for periodic readjustment of the contract price to reflect changes in market value, Georgia-Pacific still has the ultimate opportunity and risk of selling the timber at above or below market value. Even a minor opportunity to sell in the market is enough to give a timber cutter an economic interest in the timber. *See Thornberry Const. Co., Inc. v. United States*, 576 F.2d 346 (Ct.Cl.1978).

The contract at issue in *Giustina*, like those in the present case, also limited the ability of the purchaser to assign its contract rights and provided that the risk of loss remained with the seller until the timber was cut. The court expressly rejected the proposition that those provisions did not make the purchaser the owner. 313 F.2d at 712–13 & n.6. The court also rejected the argument made by Georgia-Pacific here that the purchasers made no "investment" within the meaning of Treas.Reg. § 1.611–1(b)(1) because the timber was to be paid for only as removed. The court reasoned that a contract that calls for a specific amount to be purchased at a specific price within a specific time creates a liability that is itself an investment. *Id.* at 712.

The fact that *Giustina* held that the purchaser was an "owner", while the present case concerns whether the purchaser has an "economic interest" in the timber, is not a material distinction. The test used by the Supreme Court in determining if a purchaser has an economic interest—whether the purchaser looks primarily to sale in the open market for its return—is the functional equivalent of the investment opportunity and risk test of *Giustina*.[10] We also note that the court suggested in *Giustina* that the purchaser had an economic interest sufficient to claim depletion. *Id.* at 714–15 n.11.[11]

## V. Conclusion

We conclude that the contracts in question here constitute deferred intercompany transactions; that Timber and Georgia-Pacific were entitled to claim depletion for standing timber cut; and that the provision of Treas.Reg. § 1502–13(c)(4) providing for taxation of the gain from such a transaction at ordinary income rates is therefore applicable.

The judgment of the district court is AFFIRMED.

---

10. Int.Rev.Code § 631(b) now provides that "the term 'owner' means any person who owns an interest in such timber, including a sublessor and a holder of a contract to cut timber." There was no definition of owner in the predecessor to § 631(b), which governed in *Giustina*. We need not determine whether any party classified as an owner under § 631(b) has an "economic interest" sufficient to allow it to claim depletion. The court in *Giustina* stated that it applied a more stringent test for ownership than that prescribed by § 631(b). 313 F.2d at 712 n.2. We apply the more stringent investment opportunity and risk test of *Giustina*, which conforms to the test for economic interest established by the Supreme Court.

11. The Government argues that Timber was entitled to claim depletion under Treas.Reg.

§ 1.631–2(e)(1), which provides in relevant part:

> Amounts paid by the lessee for timber or the acquisition of timber cutting rights, whether designated as such or as a rental, royalty, or bonus, shall be treated as the cost of timber and constitute part of the lessee's depletable basis of the timber, irrespective of the treatment accorded such payments in the hands of the lessor.

Georgia-Pacific argues that this regulation is invalid as inconsistent with the proviso of Int. Rev.Code § 631(b), quoted above at note 6. Because we determine that Timber had an economic interest under case law, we do not address the validity of the regulation.