In re **BRAZIER FOREST PRODUCTS, INC., Brazier Forest Products of Oregon, Inc., Brazier Forest Industries, Inc., and Brazier Export, Inc., Debtors.**

Bankruptcy Nos. 84–02668, 84–02374, 84–02735 and 84–03103.

United States Bankruptcy Court, W.D. Washington, at Seattle.

Oct. 30, 1991.

See also 122 B.R. 119.

Matthew Stanley, Gordon, Tomas, Honeywell, Tacoma, Wash., for debtors.

Mark Nebergall, Tax Div., U.S. Dept. of Justice, Washington, D.C., for the Government.

## OPINION ON REMAND

SAMUEL J. STEINER, Chief Judge.

This matter is before the Court on remand from the District Court with instructions (1) to make a finding of fact on whether timber on which IRC § 631(a) treatment is sought was cut by or for The Brazier Company, also known as Brazier Timber Company, or whether it was cut by or for Brazier Forest Products, Inc., and (2) to determine the correct tax liability of Brazier Export, Inc.

## WAS THE TIMBER CUT BY OR FOR THE BRAZIER COMPANY OR BY OR FOR BRAZIER FOREST PRODUCTS, INC.

This matter came before the Court on the debtor's objection to the claim of the Internal Revenue Service for income tax deficiencies for tax years 1977, 1978, and 1979. The Brazier Company and Brazier Forest Products are affiliated entities. The business of The Brazier Company is to hold timber and timber cutting rights, while the business of Brazier Forest Products is to manufacture logs into timber at its mill located at Molalla, Oregon. It was the intention of the two companies that The Brazier Company would keep Brazier Forest Products supplied with the logs needed for its mill to the extent it could. In fact, this occurred in that The Brazier Company supplied 70% of the logs of Brazier Forest Products.

The two companies filed consolidated income tax returns for the three years in question, claiming that the sales from The Brazier Company to Brazier Forest Products qualified for capital gains treatment under IRC § 631(b), which offers such treatment for the disposition of standing timber or cutting rights through a mutually binding contract, where the owner retains an economic interest. In 1981, the 9th Circuit held that affiliated corporations are not eligible for § 631(b) capital gains treatment. *Georgia–Pacific v. United States*, 648 F.2d 653 (9th Cir.1981). The debtor then attempted to amend its returns, claiming capital gains treatment pursuant to IRC § 631(a). If an owner cuts the timber for sale or use in his own business, he may elect to treat the cutting as a fictitious sale and pay capital gains tax under IRC § 631(a).

One of the issues at the trial was whether the sales from The Brazier Company to Brazier Forest Products qualified for § 631(a) treatment. This Court held that they did, and the District Court later remanded with the instruction that a finding of fact be made as to whether the timber on which § 631(a) treatment is sought was cut "by or for The Brazier Company, or, instead, was cut by or for Brazier Forest Products." (Order on Government's Appeal at 1.) If the timber was cut by or for The Brazier Company, then § 631(a) is applicable. If, on the other hand, the timber was cut by or for Brazier Forest Products, then § 631(a) is not available.

The issue and finding turn on whether The Brazier Company ever assigned standing timber or timber cutting rights to Bra-

zier Forest Products. If timber or cutting rights were assigned to Brazier Forest Products, then the cutting was done by Brazier Forest Products on its own account. If the standing timber or cutting rights were not assigned but were rather retained by The Brazier Company and the logs sold to Brazier Forest Products, then the cutting was done "for sale or use in the ... trade or business of The Brazier Company." (Order on Government's Appeal at 2.)

The Government contends that the timber and timber cutting rights were sold to Brazier Forest Products, and hence the gains are taxable as ordinary income. In support of its position, the Government relies on the terms of two virtually identical Timber Agreements which were executed by the companies in 1972 and 1974. The Agreements provided that "The Brazier Company agrees to sell standing timber or standing timber cutting rights to Brazier Forest Products, Inc." In the ruling after the trial in 1988, this Court concluded that the Agreements were not "mutually binding contracts," but that they were "illusory in that performance was optional or discretionary on the part of the promisor." (Op. on Obj. to IRS Claim at 12.) Therefore the Agreements did not qualify the debtor for § 631(b) treatment.

The conclusion that the Agreements were illusory was based on a determination that The Brazier Company did not bind itself to transfer anything to Brazier Forest Products. The conclusion is clear from a review of the documents. First, the Agreements do not identify any tracts to be assigned. Further, they reserved to The Brazier Company the right to sell timber as logs to third parties. Finally, they reserve to The Brazier Company the right to "make the final determination as to what timber tracts are to be harvested by Brazier Forest Products, Inc., when timber tracts are to be harvested, and what volume is to be removed." Accordingly, the Government is incorrect in its contention that the Agreements dictated that the timber and timber cutting rights would be sold by The Brazier Company to Brazier Forest Products.

Inasmuch as the Agreements neither operate as assignments nor obligate The Brazier Company to make any assignments to Brazier Forest Products, it is necessary to go beyond the Agreements to determine what actually occurred. Lyle Bare, former Vice President of Finance for both companies, testified that no assignment of timber or timber cutting rights ever took place. Mr. Bare's testimony was to the effect that he prepared the Agreements as accounting understandings as opposed to contractual arrangements. There were no other understandings or agreements, nor was there any evidence of specific transfers.

The Court has previously found that the Brazier companies generally complied with the Agreements, notwithstanding the fact that they were unenforceable as a matter of law. The Government has now characterized such findings as being inconsistent. These are not inconsistent findings. The first is a legal conclusion. The second is a factual determination that, notwithstanding the illusory nature of the Agreements, the parties generally conducted their affairs in a manner consistent with them. That is, 60% of The Brazier Company's logs went to the Brazier Forest Products's mill as opposed to third parties mills, and The Brazier Company supplied 70% of the logs of Brazier Forest Products. Further, the pricing followed the Agreements. The provisions for contract logging and insurance were also followed. On the other hand, Brazier Forest Products was never sold any timber or cutting rights, even though the Agreements recited an intention to do so.

Accordingly, the Court finds and concludes that the timber on which IRC § 631(a) treatment is sought was cut by or for The Brazier Company and subsequently sold to Brazier Forest Products or other third-party mills.

### 1979 TAX LIABILITY OF BRAZIER EXPORT

In tax year 1979, Brazier Export, Inc., qualified for treatment as a Domestic International Sales Corporation (DISC) under IRC §§ 991–997. In February 1986, the IRS issued a Notice of Deficiency to Brazier Export which challenged the manner in which income was allocated between Brazi-

er Export and Brazier Forest Products, its supplier. The government asserts that a portion of the net income which the debtor allocated to Brazier Export should instead be allocated to Brazier Forest Products. Since DISC income is not recognized, a lower allocation of income to Brazier Export would result in an increase in the total tax liability for the group of Brazier companies.

This Court previously held that the government was prohibited from assessing an additional tax against Brazier Export because the statute of limitations had run. The ruling was reversed on appeal, and the matter was remanded for the purpose of determining the correct tax liability.

The ultimate issue is to determine the cost of export lumber sold by Brazier Export. In doing so, the government first allocated the total receipts of Brazier Forest Products between logs, lumber, and "other". The "other" refers to by-products, including chips, sawdust, bark, and economy lumber. Since export sales were limited to lumber, the gross allocations made to lumber had to be further apportioned between foreign and domestic sales.

There are two areas in which the IRS examiner and the debtor differed in their accounting. The first related to the treatment of by-product, or "other" income, and the second pertained to the allocation of indirect expenses between foreign and domestic lumber sales. Resolution of these issues should allow the parties to compute any actual tax liability.

■ A. *Should income from by-products be treated as a separate profit center or as an offset against the cost of lumber?* This problem relates to the treatment of by-product income on Brazier Forest Products's Statement of Income for year ending November 30, 1979. In the government's calculations, by-products are treated as a separate profit center under the column designated "other", apart from lumber and logs. Under this analysis, by-products sales result in taxable, domestic income. On the other hand, the debtor uses by-product income to offset the cost of lumber, thus increasing the total net profit from the sale of lumber. Ultimately this results in a proportionate increase in both domestic and foreign sales.

According to the testimony of Mr. Bare, lumber companies formerly burned the sawdust, bark, and other by-products from lumber production. At some point it was determined that by marketing the products they could realize some additional revenue over costs. In this case, the debtor kept a record of by-product revenues, as well as the direct costs of by-product operations, in order to monitor internally the profitability of the enterprise. Had the debtor intended to treat by-products as a separate profit center, it would have allocated a portion of the log cost to by-products. Further, according to the testimony of Mr. Bare, approximately 60% of the weight of the log goes into by-products. If 60% of the cost of logs were allocated to by-products, the "other" column would not show a profit but would instead show a loss. The debtor in fact charged all of the raw material costs to lumber. Therefore, while by-products appear to be profitable, on a factual basis they were, according to Mr. Bare, "tremendous losers". (Transer. 5/11/87 at 115.) Mr. Bare further testified that this treatment of by-product revenues appears to be standard industry practice.

The government does not take issue with the assertion by the debtor that its accounting method is standard for the industry, nor that it is reasonable. Instead, the government contends that the debtor showed by-products separately in its books and records, and that to report them differently for tax purposes constitutes an impermissible change in the debtor's accounting method. Treas.Regs. § 1.994–1(c)(6) provides that "the taxpayer's method of accounting used in computing taxable income will be accepted...." The record contains no suggestion that the debtor's method is inconsistent or in any way conflicts with its tax reporting. Given the latitude afforded to taxpayers to select their accounting methods, the Court concludes that the debtor's internal record-keeping does not preclude it from adopting a reasonable, standard approach to its reporting for income tax purposes.

■ B. *Should expenses of the Brazier companies be allocated on the basis of gross receipts or on a volume basis?* The government has also challenged the method used by the debtor to allocate expenses between its foreign and domestic lumber sales. There is no issue as to the allocation of direct costs; rather, the issue is how to allocate overhead expenses that are not directly related to any category of gross income. Such indirect expenses must be apportioned "in a manner which reflects to a reasonably close extent the factual relationship between the deduction and the grouping of gross income." Treas.Regs. § 1.861.8(c)(1).

The IRS examiner made these expense allocations on the basis of gross receipts. That is, he determined the percentage of total income attributable to each category and then prorated the expenses in the same percentages. The debtor, on the other hand, allocated the expenses on the basis of volume or footage. Brazier Export's approach results in a higher net profit attributable to foreign sales.

The basis for the debtor's approach is that costs and expenses are factually more closely related to production than they are to sales dollars. Thus foreign sales produced a higher profit, for the reason that the export lumber was a higher quality product. Further, the export lumber consisted of large cuts that required limited handling—no planing and no drying. On the other hand, the domestic production consisted of smaller pieces which are all kiln-dried and nearly all planed. For these reasons, export lumber required less effort and smaller investment in terms of equipment and plant application, personnel, time, etc. Thus, according to the debtor, adoption of a volume or footage measure provides a more accurate and realistic factual basis on which to apportion overhead.

The government's examiner acknowledged in his testimony that, under Treas. Reg. § 1.861.8, "you can allocate in many ways, as long as you get a reasonable result. We determined that a reasonable result in this case would be the gross income method and I allocated the expenses on the gross income method". (Transer. 5/11/87 at 97.) While the examiner testified that he felt his method of allocation was more reasonable than the debtor's, the government did not assert any legal basis or any convincing factual basis for rejecting the debtor's allocation procedure as being unreasonable. On the other hand, the debtor has articulated a realistic and factual basis for its methods, and its computations should thus be accepted.

CONCLUSIONS

1. The timber was cut by or for The Brazier Company.

2. The accounting methods of Brazier Export are reasonable and are standard practices for the industry and therefore must be accepted by the Internal Revenue Service.

3. Brazier Export's allocation of expenses on a volume basis are reasonable, and its calculations should have been accepted by the Internal Revenue Service.

4. The tax liability of Brazier Export will be computed accordingly.

5. Counsel for the debtor will prepare and present an Order for entry within thirty days from the date of this opinion.