GERALD E. ECK AND G. MARLENE ECK, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 30251–89.          Filed July 6, 1992.

*Scott R. Miller,* for petitioners.
*Cheryl B. Harris,* for respondent.

OPINION

RAUM, *Judge:* The Commissioner determined deficiencies and additions to tax against petitioners in the following amounts:

| TYE | Deficiency | Sec. 6661 |
|---|---|---|
| Dec. 31, 1985 | $9,212 | $2,350.25 |
| Dec. 31, 1986 | 11,448 | 2,862.00 |

Except as otherwise indicated, all section references are to the Internal Revenue Code as in effect for the taxable years at issue. All Rule refrences are to the Tax Court Rules of Practice and Procedure.

At the time they filed the petition herein, petitioners resided in Salina, Kansas. The case was submitted on the basis of a stipulation of facts and exhibits. As a result of concessions by both sides the only issue remaining for decision is whether petitioners were entitled to long-term capital gain treatment for the gain from the sale of Christmas trees from their Christmas tree farming operation.

During the years at issue, petitioners owned and operated two Christmas tree farms near Salina, Kansas. The only evidence in the record as to the nature and details of the operation of the farms is contained in an affidavit of petitioners. The parties have stipulated that petitioners would so testify as to the matters therein. However, respondent did not stipulate the truth of the facts stated in the affidavit. Nevertheless, respondent has not challenged the truth of any of the facts thus stated. In the circumstances, we do the same. The body of that affidavit in its entirety reads as follows:

Petitioners operate a Christmas tree farm[1] named BEL Christmas Tree Farm in Salina and Smolan, Kansas. The opening date in Smolan is the day after Thanksgiving. At Salina the opening date is December 1. The customer arrives and parks in a designated area. The first contact the customer has with a tree farm employee is when he or she is met by a greeter or a tree loader. Many customers ask questions about the manner in which the tree farm operates. Other customers exchange greetings, say they have been to the tree farm before and proceed on to the field.

The customers are instructed that the trees that are for sale are tagged. There are two tags on the tree. One tag states "Christmas Tree Cutting

---

[1] The stipulation of facts refers to "two Christmas tree farms", while petitioners' affidavit refers to "a Christmas tree farm".

Permit" and has a line for the customer's names. The other tag contains information about care of the tree. Both tags contain the price of the tree.

In the field are cutters in red overalls. The customer proceeds to choose his or her tree and then signals to a cutter. The cutter or the customer writes the customer's name on the tags to confirm the sale at the agreed price and the customer is given the tag labeled Tree Cutting Permit. The tree is then cut either by the cutter or by the customer. Approximately 60–65% of the taxpayers' trees are cut by customers themselves.

The tree is taken to the barn where the tree is paid for after the customer presents the "Tree Cutting Permit".

In their income tax returns for 1985 and 1986, petitioners submitted copies of Schedule C, entitled Profit or (Loss) From Business or Profession, which reported gross receipts or sales of $4,182 and $4,808 relating to "Tree stands, etc." and "Tree stands, wreath rings, etc." in 1985 and 1986, respectively. Each of these amounts was reduced by the "cost of goods sold", which was stated to be $3,588 in 1985 and $3,767 in 1986. Petitioners also claimed deductions relating to their Christmas tree farming operation in the amounts of $36,076 and $36,300, respectively. Thus, petitioners' Schedule C Forms for 1985 and 1986 claimed net losses from their Christmas tree farms of $35,482 and $35,259, respectively. Neither of these forms reported as income any proceeds from the sale of Christmas trees.

Petitioners reported the proceeds from the sales of Christmas trees for their taxable years 1985 and 1986 on Form 4797, entitled in part Gains and Losses from Sales or Exchanges of Assets Used in a Trade or Business. The sales of Christmas trees were reported as "Sales or Exchanges of Property Used in a Trade or Business * * *—Property Held More Than 6 Months". The "gross sales price" for the Christmas trees sold in 1985 and 1986 was stated to be $56,247 and $78,287, respectively. In computing the amount of gain for each year, subtractions were made from the gross sales price in the amounts of $4,105 and $4,434 in respect of "Cost or other basis, plus improvements and expenses of sale". Petitioners thus reported long-term capital gain pertaining to the sales of Christmas trees in the amount of $52,142 for 1985 and $73,853 for 1986, and claimed 60 percent of each of these amounts as a deduction pertaining to long-term capital gain.

In the notice of deficiency, the Commissioner determined that "it is [sic] has not been established that the sale of

christmas trees qualifies for capital gain treatment. The sale of these trees is properly reported as ordinary income". We uphold the determination of the Commissioner on this issue.

As an initial matter, the resolution of the controversy herein is governed by section 1231. There is no dispute that if the Christmas trees sold by petitioners were "property used in the trade or business" as defined in section 1231(b), then the gain realized on such sales was long-term capital gain. Section 1231(b) provides in pertinent part that the term "property used in the trade or business * * * includes timber * * * with respect to which section 631 applies." The provisions of section 631 are set forth in the margin.[2]

Section 631(a) and (b) both relate to capital gain treatment on the cutting or disposal of timber in certain circumstances. The predecessor of section 631 became part of our revenue law in 1943 as section 117(k) of the Internal Revenue Code of 1939.[3] To the extent relevant here, the provisions of subsections (a) and (b) of section 631 are substantially identical with paragraphs (1) and (2) of section 117(k) of the 1939 Code, respectively, except as noted in the next paragraph of this opinion. These provisions together compose a package for the benefit of the timber and lumber industry. Various rep-

---

[2] SEC. 631. GAIN OR LOSS IN THE CASE OF TIMBER, COAL, OR DOMESTIC IRON ORE.

(a) ELECTION TO CONSIDER CUTTING AS SALE OR EXCHANGE.—If the taxpayer so elects on his return for a taxable year, the cutting of timber (for sale or for use in the taxpayer's trade or business) during such year by the taxpayer who owns * * * such timber (providing he has owned such timber * * * on the first day of such year and for a period of more than 6 months before such cutting) shall be considered as a sale or exchange of such timber cut during such year. If such election has been made, gain or loss to the taxpayer shall be recognized in an amount equal to the difference between the fair market value of such timber, and the adjusted basis for depletion of such timber in the hands of the taxpayer. Such fair market value shall be the fair market value as of the first day of the taxable year in which such timber is cut, and shall thereafter be considered as the cost of such cut timber to the taxpayer for all purposes for which such cost is a necessary factor. * * * For purposes of this subsection and subsection (b), the term "timber" includes evergreen trees which are more than 6 years old at the time severed from the roots and are sold for ornamental purposes.

(b) DISPOSAL OF TIMBER WITH A RETAINED ECONOMIC INTEREST.—In the case of the disposal of timber held for more than 6 months before such disposal, by the owner thereof under any form or type of contract by virtue of which such owner retains an economic interest in such timber, the difference between the amount realized from the disposal of such timber and the adjusted depletion basis thereof, shall be considered as though it were a gain or loss, as the case may be, on the sale of such timber. In determining the gross income, the adjusted gross income, or the taxable income of the lessee, the deductions allowable with respect to rents and royalties shall be determined without regard to the provisions of this subsection. The date of disposal of such timber shall be deemed to be the date such timber is cut, but if payment is made to the owner under the contract before such timber is cut the owner may elect to treat the date of such payment as the date of disposal of such timber. * * *

[3] Sec. 117(k) entered the Internal Revenue Code of 1939 through the Revenue Act of 1943, ch. 63, sec. 127, 58 Stat. 46-47.

resentatives of that industry had appeared before the House Ways and Means and Senate Finance Committees. Hearings on Revenue Revision of 1943 Before the House Ways and Means Committee, 78th Cong., 1st Sess. 795-844 (1943) (hereinafter cited as House Hearings); Hearings on H.R. 3687 Before the Senate Finance Committee, 78th Cong., 1st Sess. 660-669 (1944). The industry's major concern related to the taxation as ordinary income of gains realized when the owner of standing timber cut such timber and sold it in his trade or business, in contrast to the capital gains treatment that would be applicable if the standing timber itself were sold uncut. Also, the timber industry objected to ordinary income treatment of amounts received pursuant to so-called cutting contracts, where, for example, the timber owner arranged for another person to cut specified timber over a period of time, with consideration payable in an amount on each occasion that the timber was cut determined on the basis of the number of board feet thus cut. It was pointed out that the IRS (then referred to as the Bureau of Internal Revenue) had proposed ordinary income treatment of the amounts thus received, on the theory that the timber owner had "leased" his property. House Hearings, *supra* at 796-797, 799.

Section 117(k) of the 1939 Code was enacted in response to the foregoing concerns of the timber industry.[4] It contained nothing relating to Christmas trees, which are hardly timber or sources of lumber as these terms are commonly understood. However, upon enactment of the 1954 Code, section 117(k) was redesignated section 631, and a new last sentence was added to section 631(a), which made both subsections (a) and (b) applicable to evergreen trees that are more than 6 years old when severed from the roots and are sold for "ornamental purposes", concededly referring to Christmas trees. This provision was added to the bill then pending by the Senate Finance Committee without any explanation other than the mere statement that it included Christmas trees within the scope of section 631(a) and (b). S. Rept. 1622, 83d Cong., 2d Sess. 81, 338 (1954).

We may at once dismiss section 631(a) as affording any relief to petitioners. It has been stipulated that they made no

---

[4] Indeed, the provisions of sec. 117(k) of the 1939 Code largely followed a proposed draft supplied by the timber industry. See Hearings on Revenue Revision of 1943 Before the House Ways and Means Committee, 78th Cong., 1st Sess. 795-844 (1943).

such election as is required for application of section 631(a), and petitioners do not argue otherwise. Their only contention is that they are covered by section 631(b), since, according to them, they disposed of the Christmas trees with a retained economic interest. It is their position in substance that they sold each Christmas tree to the purchaser pursuant to a contract with the purchaser that left petitioners with a retained economic interest in such tree until the tree selected by the purchaser was actually cut and paid for. On the facts of this case, bearing in mind that we have only petitioners' affidavit before us and that the burden of proof was upon them, we find that their position is faulty, to say the least. It does not withstand close examination.

The affidavit tells us that the trees that are for sale have two tags, one of which is identified as a "Christmas Tree Cutting Permit" and has a line for the customer's name. The other contains information about the care of the tree, and both tags contain the price of the tree. The customer selects the desired tree and signals to a cutter. The affidavit then continues:

> In the field are cutters in red overalls. The customer proceeds to choose his or her tree and then signals to a cutter. The cutter or the customer writes the customer's name on the tags to confirm the sale at the agreed price and the customer is given the tag labeled Tree Cutting Permit. The tree is then cut either by the cutter or by the customer. Approximately 60-65% of the taxpayers' trees are cut by customers themselves.
>
> The tree is taken to the barn where the tree is paid for after the customer presents the "Tree Cutting Permit".

It is this evidence that is the basis for petitioners' contention that upon insertion of the customer's name on the tag labeled Tree Cutting Permit, a contract was entered into with the customer, resulting in petitioners' "retained economic interest" that persisted at least until the tree was cut, thus making section 631(b) applicable.

Regardless of whether the transaction of selling a Christmas tree to the customer can be fragmented so as to treat one fragment as a "contract", it is far from clear on the evidence that a binding contract was actually entered into prior to the cutting. Of far greater significance here is that the selection of the tree by the customer, the entry of the customer's name on the tag, and the cutting of the tree were merely component parts of a single integrated transaction

consisting of the sale of a Christmas tree by petitioners. For aught that appears in this record, the entire process of entering the customer's name on the tag and the cutting of the tree could have amounted to but a matter of minutes, certainly substantially less than an hour. The fact that this case was submitted to us solely on the basis of the stipulation of facts does not relieve petitioners of their burden of proof, *Borchers v. Commissioner,* 95 T.C. 82, 91 (1990), affd. 943 F.2d 22 (8th Cir. 1991), and petitioners have not shown otherwise.

What we have here in each instance is simply the sale of a Christmas tree, carried out in a single brief continuous period of minutes. Petitioners have not presented any evidence to the contrary. This is hardly the type of situation contemplated by Congress in enacting section 631(b). In commenting upon the purpose and scope of section 117(k)(2) of the 1939 Code (the predecessor of section 631(b) involved herein), the Senate Finance Committee stated in part (S. Rept. 627, 78th Cong., 1st Sess. (1943), 1944 C.B. 973, 993):

> Your committee is of the opinion that various timber owners are seriously handicapped under the Federal income and excess profits tax law. The law discriminates against taxpayers who dispose of timber by cutting it as compared with those who sell timber outright. The income realized from the cutting of timber is now taxed as ordinary income at full income and excess profits tax rates and not at capital gain rates. In short, if the taxpayer cuts his own timber he loses the benefit of the capital gain rate which applies when he sells the same timber outright to another. *Similarly, owners who sell their timber on a so-called cutting contract under which the owner retains an economic interest in the property are held to have leased their property and are therefore not accorded under present law capital-gains treatment of any increase in value realized over the depletion basis.*
>
> *       *       *       *       *       *       *
>
> *Section 117(k)(2) * * * will afford relief to those who have leased their property under a contract whereby they retain an economic interest in the timber and are not entitled under the present law to capital gains treatment because of that fact.* [Emphasis added.]

This legislative history indicates that Congress intended section 117(k)(2) to preclude the IRS from using the reasoning of *Burnet v. Harmel,* 287 U.S. 103 (1932), and related cases to require the treatment of amounts received under a lease of timber or timberland as ordinary income, where the owner

of the timber retains an economic interest in such timber following its disposal.[5] *Georgia-Pacific Corp. v. United States,* 648 F.2d 653, 657 (9th Cir. 1981); *United States v. Giustina,* 313 F.2d 710, 713 n.7, 714 n.11 (9th Cir. 1962). As stated by the Ninth Circuit in the *Georgia-Pacific* case, "the section 631(b) phrase 'under any form or type of contract by virtue of which such owner retains an economic interest' was merely a shorthand form to refer to the type of contract to which *Burnet [v. Harmel] might otherwise be applied." Georgia-Pacific Corp. v. United States, supra* at 657. (Fn. ref. omitted; emphasis added.)

Without engaging in a lengthy analysis of *Burnet v. Harmel* and related cases, it is clear that the type of situation before us in no way resembles what was involved in those cases. In *Burnet v. Harmel,* a natural resource (oil and gas) was extracted from land over a period of years under a contract involving exploration, drilling, and other activities, to which the transfer of ownership of the oil and gas was merely incidental. By contrast, what we have here is a simple transaction consisting of the sale of a single Christmas tree that was cut by or for the customer after selection and having the purchaser's name written on a cutting permit. Section 631(b) was not intended to cover such a transaction. See S. Rept. 627, *supra.*

The parties have discussed various decisions involving section 631(b), but none of them presented anything like the situation before us in this case. We do not find it useful or helpful to engage in a discussion or analysis of such cases. We decide the present case on the record before us. We hold that the gain on the sales of petitioners' Christmas trees is ordinary income, not capital gain. The result we reach is in accord with Rev. Rul. 77-229, 1977-2 C.B. 210, which concludes that section 631(b) is not applicable to the sale of Christmas trees to customers on a "choose and cut" basis.

---

[5] The position then relied upon by the IRS was reflected in G.C.M 22730, 1941-C.B. 214, 215, in which it was stated that:

a sale of capital assets is not involved in a lease agreement in which the lessor, in consideration of a bonus or lump sum cash payment made at the time the lease was executed * * * and stipulated royalties measured either by a percentage of production under the lease or by a stated sum per unit extracted and sold * * * which are payable over the entire lease life, grants a lessee the right to enter upon and use the land for purposes of exploitation. (See *Bankers Pocahontas Coal Co. v. Burnet,* 287 U.S., 308, Ct. D. 618, C.B. XII-1, 272 * * * [1933], and *Burnet v. Harmel,* 287 U.S. 103, Ct. D. 611, C.B. XI-2, 210 (1932) * * *).

To reflect concessions made by the parties,

*Decision will be entered under Rule 155.*